UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

MEGAN LANGE,                                          :
                                                      :
                    Plaintiff,                        :
                                                      :
        -against-                                     :        **COMPLAINT**
                                                      :
EMPIRE HOLDINGS AND INVESTMENTS,                      :
LLC, TMPL LEXINGTON LLC d/b/a TMPL                    :        **JURY TRIAL**
LEXINGTON, EMPIRE HELLS KITCHEN                       :        **DEMANDED**
TMPL LLC d/b/a TMPL HELL'S KITCHEN,                   :
and PATRICK WALSH,                                    :
                                                      :
                    Defendants.                       :

---------------------------------------------------------------------X

Plaintiff Megan Lange ("Plaintiff" or "Lange"), by her attorneys Frontera Law

PLLC, complaining of defendants, Empire Holdings And Investments, LLC, TMPL

Lexington LLC d/b/a TMPL Lexington, Empire Hells Kitchen TMPL LLC d/b/a

TMPL Hell's Kitchen, and Patrick Walsh (collectively, "Defendants"), alleges as

follows:

## PRELIMINARY STATEMENT

**1.**      Defendants own and operate multiple luxury fitness centers including: TMPL

Clubs in New York ("TMPL" or "TMPL gyms"), LIV Fitness Clubs in Puerto Rico

("LIV"), and the Palm Beach Sports Club fitness centers in Florida ("PBSC").

Plaintiff worked for TMPL throughout her employment.

**2.**      Patrick Walsh is the CEO and owner of Empire Holdings And Investments,

LLC, the parent company for TMPL, LIV, and PBSC. He is also an investor and

entrepreneur, and the former CEO of Town Sports International, a publicly traded company and former parent company of New York Sports Club.

**3.**     Lange, a seasoned fitness and marketing executive, began working for Defendants in 2018, first as a cycling instructor and then also as a personal trainer, all while working full-time as a marketing director and brand strategist. She was then hired as Brand Director of TMPL in August 2021. Within weeks of starting her new role, Walsh pursued a romantic relationship with Lange, and they began dating secretly (at Walsh's request).

**4.**     Shortly thereafter, Walsh began providing directives and making requests of Lange to change her employment status at the company, allegedly to be able to date openly and start a separate business partnership together. Lange complied with Walsh's requests, trusting him to have her best interest in mind.

**5.**     Walsh also made false promises to Lange of promotion and career growth. He fraudulently induced Lange to enter a business partnership that was utilized as leverage throughout the course of events, which he subsequently abandoned.

**6.**     Lange began noticing inconsistencies and concerning behavior by Walsh, including suspected abuses of power, corporate mismanagement, and inappropriate relationships with other female employees of the company.

**7.**     Lange cautioned Walsh about serious financial and legal risks to both their business venture and TMPL if these issues were not remedied. In response, he silenced, intimidated, and demoted Lange. When she raised concerns about his

actions and sought support from the leadership at TMPL, she was retaliated against and ultimately forced to resign from her employment.

**8.**     Walsh and Lange's entire relationship was marked by a power imbalance in which Walsh utilized pervasive deception, stonewalling, and emotional, financial, and professional manipulation against Lange. She was subjected to harassment, retaliation, and a hostile work environment because Defendants engaged in and/or refused to remediate persistent harassing and retaliatory behavior initiated by Walsh.

**9.**     Walsh's manipulative tactics continued beyond her tenure working for Defendants. Despite claiming that Lange is simply a jealous ex-girlfriend who wants him back, Walsh visited Lange at her home approximately 20 times since she officially took legal action by filing a Charge with the EEOC in April 2023. He repeatedly approached Lange and requested she cease all legal proceedings, purportedly so they could continue their romantic relationship and have a future together.

**10.**     Defendants' conduct was knowing, malicious, willful, and wanton and showed a reckless disregard for Lange. It has and continues to cause Lange to suffer substantial economic and non-economic damages, as well as severe mental anguish and emotional distress.

**11.**     Plaintiff brings this action seeking declaratory, injunctive, equitable, and affirmative relief. Plaintiff also seeks monetary damages to redress the injuries she suffered as a result of being subjected to unlawful employment misclassification,

fraudulent inducement, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"); the Freelance Isn't Free Act, N.Y.C. Admin. Code §§ 20-927, *et seq.* ("FIFA"), and the anti-retaliation provision of the New York Labor Law, § 740 *et seq.* ("NYLL").

## JURISDICTION & VENUE

12.     Jurisdiction of this Court is proper under 42 U.S.C. §2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

13.     This Court has supplemental jurisdiction over Plaintiff's state and city law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial portion of the events or omissions giving rise to this action occurred within this judicial district.

## NOTICE

15.     Within ten days of the filing of this Complaint, Plaintiff will serve a copy of the Complaint on the New York City Commission on Human Rights and the New York City Corporation Counsel, thereby satisfying the notice requirements of N.Y.C. Admin. Code § 8-502.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

**16.**     Plaintiff filed a timely Charge of Discrimination ("Charge") with the U.S.

Equal Employment Opportunity Commission ("EEOC") on April 22, 2023.

**17.**     The EEOC issued a Notice of Right to Sue on June 14, 2023.

**18.**     This action is being commenced within 90 days of receipt of the Notice of

Right to Sue.

## THE PARTIES

**Plaintiff Megan Lange[1]**

**19.**     Lange resides in New York, New York.

**20.**     Lange was employed by Defendants in various capacities from 2018 through

July 2023.

**21.**     Throughout her employment, Lange's work has been based in New York.

**22.**     At all times relevant to this Complaint, Plaintiff was an employee of

Defendants as the term is defined by Title VII, NYSHRL, NYCHRL, NYLL, and

FIFA.

**Defendant Empire Holdings And Investments, LLC**

**23.**     Defendant Empire Holdings And Investments, LLC is a Florida limited

liability company doing business in New York State.

---

[1] Lange is known professionally as Megan Novak.

24.     Empire Holdings And Investments, LLC is self-described as a "holding company that acquires, develops, owns, and operates boutique luxury fitness clubs across the United States and Puerto Rico."[2]

25.     The "boutique luxury fitness clubs" that Empire Holdings And Investments, LLC currently owns and operates include: five (5) TMPL locations in New York (with a sixth location slated to open in 2024); two (2) LIV locations in Puerto Rico; two (2) PBSC locations in Florida; and also one (1) location of Christi's Fitness in Vero Beach, Florida.

26.     Empire Holdings And Investments, LLC is the parent company of, *inter alia*, Defendant TMPL Lexington LLC and Defendant Empire Hells Kitchen TMPL LLC.

**Defendant TMPL Lexington LLC**

27.     Defendant TMPL Lexington LLC is a Delaware corporation authorized to do business in the state of New York. It owns, operates, and does business as TMPL Lexington located at 155 East 53rd Street, New York, NY 10022.

28.     TMPL Lexington a luxury fitness club that belongs to the TMPL brand which currently includes 5 fitness centers.

29.     Lange helped with project management, design, and renovation of TMPL Lexington prior to its opening in 2021 and thereafter, she worked at TMPL Lexington on a regular basis.

---

[2] Empire Holdings, *About Us*, https://empireholdings.com/ (last visited September 3, 2023).

**Defendant Empire Hells Kitchen TMPL LLC**

**30.**     Defendant Empire Hells Kitchen TMPL LLC is a Delaware corporation authorized to do business in the state of New York. It owns, operates, and does business as TMPL Hell's Kitchen located at 355 West 49th Street, New York, NY 10019.

**31.**     TMPL Hell's Kitchen is a luxury fitness club that belongs to the TMPL brand which currently includes 5 fitness centers.

**32.**     Lange began her employment with Defendants at TMPL Hell's Kitchen where she taught cycling classes and conducted personal training sessions.

**33.**     Starting in or around 2021, Lange split her time working at TMPL Hell's Kitchen and the other TMPL locations.

**Defendant Patrick Walsh**

**34.**     Defendant Walsh is an individual who resides in Palm Beach County, Florida.

**35.**      Walsh owns, operates, and controls the operations and management of Defendants Empire Holdings And Investments, LLC, TMPL Lexington LLC and Empire Hells Kitchen TMPL LLC (collectively, the "Corporate Defendants").

**36.**     Throughout Plaintiff's employment, Walsh visited the TMPL gyms on a regular basis, approximately biweekly.

**37.**     Walsh held and exercised power and authority over personnel decisions at the TMPL gyms including terms and conditions of employment, hiring, firing, compensation, and policies.

**38.**     Walsh exercised this power and authority personally and through managers at the TMPL gyms.

**39.**     Walsh regularly communicated with TMPL's executive team and held weekly meetings with the leadership of TMPL, LIV, and PBSC to stay up to date with the goings on at each gym.

**40.**     When Walsh was present at the TMPL gyms, he personally supervised the work being done by Plaintiff and other employees.

**41.**     Together with the Corporate Defendants, Walsh jointly employed Plaintiff at all relevant times.

**42.**     At all times relevant, Defendants employed fifteen or more employees.

## **FACTUAL ALLEGATIONS**

**43.**     The homepage of the TMPL gyms website prominently features a photo of Lange exercising and describes TMPL as follows:

> TMPL is a fitness experience unlike any other-- a visionary boutique gym that could have only been born in New York. Dedicated to the rituals that elevate your entire wellbeing, TMPL shatters traditional molds of the fitness industry; a place where leading-edge technology, world-class fitness, art, and culture merge.
>
> Copy-and-paste is not part of our lexicon– each club is a unique reflection of its members, community, and culture of the surrounding neighborhood.
>
> We are driven by the understanding that true wellness is achieved through a combined focus on science and spirit- we are led by a team of world-class, industry-leading fitness, wellness, and hospitality professionals, who know a fitness club isn't just a place you come to train- it's your

> sanctuary, where you check the demands of outside life at
> the door. Emerge renewed, stronger, and inspired.[3]

**44.**    Notably, Plaintiff wrote the text for the TMPL gyms website during her

tenure as Brand Director.

**45.**    Lange described TMPL as a sanctuary that will leave you renewed, stronger,

and inspired because that is how she felt about the fitness centers for much of her

employment.  However, that changed shortly after Lange began working directly

with Walsh and his executive team.

**46.**    After approximately three years of work as one of TMPL's most popular

cycling instructors and a new personal trainer with a growing book of clients, Lange

was promoted to TMPL Brand Director in August 2021.

**47.**    Lange was promoted to Brand Director after meeting Walsh for the first time

in July 2021. At that time, Walsh told Lange that he wished to position TMPL as

luxury boutique fitness clubs but was not equipped to do so because he and his

executive team all came from a background of high-volume, mid- to budget-priced

fitness centers.

**48.**    Unlike Walsh and his team, Lange had experience working in luxury brands

and hospitality. Lange was also a well-rounded fitness professional and had nearly

a decade of experience in marketing, event planning, and brand strategy in various

industries in the United States and Europe.

---

[3] TMPL, https://www.tmplclubs.com/ (last visited Sept 11, 2023).

**49.**    Lange's professional background made her uniquely qualified to work alongside Walsh to reimagine TMPL as a luxury fitness brand.

**50.**    Walsh created the role of Brand Director for Lange and officially hired her for the role in August 2021.

**Lange's Accomplishments as Brand Director**

**51.**    As Brand Director, Lange was responsible for creating a new brand vision for TMPL, including oversight of creative direction, marketing, partnerships, and brand experience. Lange also served as a project manager and oversaw many aspects of the design and renovation of TMPL Lexington, Defendants' 24,000 square-foot flagship location, including a lounge, gym, group fitness studios, locker rooms, and the company's first ever recovery spa.

**52.**    Within her first two months as Brand Director, Lange developed a comprehensive new brand and content strategy, filmed and directed a series of promotional videos, held a photography shoot of all five gyms, and created a full campaign and launch strategy for TMPL Lexington.

**53.**    Lange's other accomplishments as Brand Director include, inter alia:  (1) growing TMPL's social media audience by 100% and increasing engagement and reach by 400% and 200%, respectively; (2) serving as creative and content director for all photo shoots, filming, advertising, apparel, and design elements within the TMPL gyms; (3) the creation and roll out of a strategic membership price increase growing TMPL's revenue by up to 40% on new membership sales; and (4) initiating and securing key partnerships to boost TMPL's image and recognition in the luxury

market. Lange developed relationships and secured partnerships with various entities including an industry leader in fitness programming on a North-America exclusive product launch, a luxury hair care brand on an exclusive partnership, a major luxury women's fashion label, and a globally renowned interior designer.

54.  Lange consistently received positive feedback from coworkers, gym members, partners, peers, and vendors.

55.  Lange's ideas and recommendations are still being carried out by Defendants, one example being, a company retreat held in August 2023 during which management was asked to read a book entitled, "Unreasonable Hospitality" by Will Guidara.

56.  Lange gifted the book "Unreasonable Hospitality" to Walsh in 2022, telling him she believed they could apply the book's concept of hospitality as a key to success and brand loyalty to the operation at TMPL.

57.  Lange's professional successes at TMPL were achieved in spite of several significant challenges.

58.  Soon after beginning her role as Brand Director, Lange noticed that TMPL was functioning without an official budget. She also identified a lack of transparency regarding overarching strategies and projections, lack of clarity about company ownership, and a lack of standard operating procedures.

59.  Lange was surprised by this discovery but saw it as an opportunity to contribute and implement essential structure to a young company that she believed

in. However, Defendants consistently rejected her efforts to make changes that would incorporate additional structure and transparency into the company.

60.     For example, Lange requested sales and revenue reports necessary for the development of digital advertising campaigns and promotional offers, which it is standard industry practice to provide to a person in Lange's position as it is nearly impossible to run an effective marketing program without access to that data. Lange was told she did not need that information to do her job.

**Walsh Pursues & Initiates an Intimate Relationship With Lange**

61.     Walsh and Lange began dating in or around October 2021.

62.     Walsh initiated the relationship with Lange.

63.     At the outset, Lange declined Walsh's advances and said she was worried that a personal relationship would negatively impact their work dynamic.

64.     Walsh, undeterred, continued to pursue Lange and said there was no professional conflict or TMPL policy against them dating.

65.     Lange relented and accepted Walsh's invitation to go on a date in September 2021 but ended it early, telling Walsh she didn't feel comfortable progressing further until she knew him better.

66.     Lange also told Walsh that she was hesitant to date him because of the rumors she had heard about him having inappropriate interactions with, and giving preferential treatment to, certain female employees.

67.     Walsh vehemently denied the veracity of the rumors and continued to pursue Lange.

**68.**   Lange agreed to see Walsh again on October 2, 2021. Walsh flew from Florida to spend the weekend with her, and this marked the start of their intimate relationship.

**69.**   Although Walsh had previously insisted that there was no issue or work conflict to prevent them from dating, Walsh then told Lange that he did not want anyone at TMPL to know about the relationship. He said it would harm Lange's professional credibility for people to know they were dating, so they agreed not to tell any TMPL employees about their relationship.

**Walsh Pressures Lange To Resign As An Employee**

**70.**   After approximately six months of dating, on or around March 18, 2022, Walsh told Lange during a phone call that he thought they should take a break from dating because he believed they needed to prove their working relationship was not dependent upon their romantic relationship.

**71.**   Lange was disappointed but told Walsh she respected his wishes and agreed they could end their intimate relationship but continue their professional relationship and work together to build the TMPL brand.

**72.**   A few weeks later, on or around April 4, 2022, Walsh asked Lange to meet him at his apartment.

**73.**   When Lange arrived at Walsh's apartment, he told her that he changed his mind about pausing their relationship, and had a plan for them to be able to continue dating openly and also work together.

**74.**    Walsh's plan consisted of having Lange to resign as an employee and instead work as a full-time consultant for TMPL.

**75.**    Walsh told Lange that if she resigned as an employee and became a consultant, they could then openly date because she would no longer be an employee.

**76.**    Walsh said Lange would retain the same title of Brand Director, and her work responsibilities and pay would remain the same as they were when she was an employee.

**77.**    Lange trusted Walsh and agreed to become a consultant.

**78.**    From approximately mid-April 2022 to August 2022, Lange was employed as a full-time consultant for TMPL.

**79.**    Shortly after transitioning into the consultant position, Lange created a document listing the key performance indicators ("KPIs") associated with her job. Lange did this in order to have a written accounting of what her role was and ensure that there was clarity about her job and responsibilities.

**80.**    Lange emailed the KPI document with Leah Molino ("Molino"), TMPL's Director of Human Resources, on May 3, 2022 and asked Molino to edit the document if necessary.

**81.**    Molino made no changes to the document.

**82.**    Lange continued to do the same work that she did when she was categorized as Defendants' employee.

**83.**     Lange's work remained the same but her pay decreased from a monthly salary of $11,000 to $8,000.

**84.**     Walsh convinced Lange to accept the pay decrease by explaining that her take-home pay would end up being about the same because she could expense many of her work-related costs. Also, he and Lange agreed that she would be eligible for a raise after six months.

**85.**     A consultant is a type of independent contractor.

**86.**     Defendants intentionally misclassified Lange as an independent contractor instead of an employee.

**87.**     Defendants continued to supervise, control, and direct Lange's work in a manner consistent with her previous status as an employee.

**88.**     Although Lange was paid more than $800 in a 120-day period, Defendants failed to enter into a written contract with her specifying inter alia, the work to be performed, amount of pay for the work, and date(s) of payment, in violation of FIFA.

**Walsh Convinces Lange To Be His Business Partner**

**89.**     On April 4, 2022, the same day he asked Lange to work as a consultant, Walsh also asked Lange to become his business partner in a hospitality company that would be created specifically to do business within TMPL.

**90.**     The inaugural concept was a champagne bar within TMPL Lexington (hereinafter, the "Champagne Lounge") that would serve as a unique differentiator for TMPL within the fitness market, providing a luxury amenity for members, along with a private event space.

**91.**     Although Walsh and Lange had been discussing and developing this concept for some months, and Lange had already begun the initial exploratory work for the design and the liquor license application, this was the first time that Walsh offered her the business partnership opportunity.

**92.**     Walsh offered Lange majority ownership (55% equity) and she accepted his offer.

**93.**     Seven/Twenty Hospitality Group, LLC was created on June 9, 2022. It was formed to serve as the holding company for the Champagne Lounge.

**94.**     Lange agreed to do most of the initial planning, scheduling, and coordinating to get the Champagne Lounge up and running. Walsh agreed to manage the company's finances and accounting and provide startup capital.

**95.**     Lange took her role very seriously and updated Walsh by phone, text, and email about the Champagne Lounge progress on approximately a daily basis.

**Walsh Pressures Lange To Resign As A TMPL Consultant**

**96.**     In or around June 2022, Walsh began to pressure Lange to resign from her position of consultant.

**97.**     The pressure to resign began in response to a conversation between Lange and Walsh on or about June 12, 2022, when Lange asked Walsh about the nature of his relationship with a female employee in Florida. They had been photographed together in a non-work setting and their poses suggested that more than a professional relationship existed between them.

**98.**     Walsh denied the existence of anything other than a professional relationship between him and the employee.

**99.**     Lange expressed concern about the optics of Walsh being seen with an employee in a close embrace, wearing swimwear in a non-work setting, especially because of the already prolific rumors that existed about his inappropriate interactions with female employees.

**100.**    Walsh brushed off Lange's comments and abruptly changed the topic to ask her, "what's really changed at TMPL since you started working here?"

**101.**    Lange was alarmed and offended by Walsh's questioning of her contributions to TMPL, not only because it seemed to be an intentional deflection from the conversation regarding his relationship with an employee, but because it was also a departure from his previous glowing recognition of Lange's significant contributions to the growth and success of TMPL.

**102.**    Later that day, June 12, 2022, Lange emailed Walsh with a list of her recent professional accomplishments and achievements at TMPL. She also attached a link to the KPI document she sent to Molino in May. In the email, Lange requested feedback if there was any work he wanted her to do differently. Walsh replied with just one sentence later that evening, "Thanks for this recap."

**103.**    Lange continued to work as Brand Director and had fewer meetings and interactions with Walsh over the next few weeks. Walsh, who seemed to be distracted and disinterested in talking about plans for TMPL, did not mention her work contributions during the meetings but Lange did notice that his demeanor

towards her had changed, as well as some of the attitudes she had known him to demonstrate before this time.

**104.**    In or around late June 2022, Lange and Walsh revisited an ongoing discussion about the importance of incorporating more diversity in TMPL's brand marketing and culture. Lange also reiterated her desire to portray subjects in TMPL imagery as strong, empowered, and confident, rather than overtly sexy. Walsh had initially supported these marketing ideas. However, Walsh now told Lange that he wanted sexier imagery and the gyms full of "girls with hot asses" because, according to him, that's why men join a gym, insinuating that they worked out at the gym to be voyeurs. Walsh also stated several times that he didn't want the TMPL gyms to be "gay gyms."

**105.**    On July 13, 2022, Lange met with Walsh at Wallsé Next Door, a restaurant in the West Village, Manhattan, to address and try to resolve some of the tension from their recent interactions.

**106.**    During their conversation, Lange brought up the fact that Walsh seemed to be disengaged and not have his priorities in line with the welfare of the company, citing his recent comments about being occupied with having the gyms full of "girls with hot asses", as well as recent rumors at TMPL regarding Walsh's conduct with female employees. They had increased in recent weeks and Lange was concerned about how his conduct might affect the success of the Champagne Lounge due to potential legal liability and financial loss if the rumors turned out to be true. She was also confused as to why Walsh had insisted their relationship remain a secret if

he was comfortable spending time with other female employees so openly that the interactions led to rumors.

**107.**   Lange also asked Walsh to clarify the status of their relationship. Although they were no longer in a serious relationship, they were still intimate and she asked what that meant for them moving forward.

**108.**   In response, Walsh told Lange that he could not be in a committed relationship and needed to be free to "fuck whoever I want, whenever I want."

**109.**   Lange was shocked by this statement because Walsh had not previously indicated that he was interested in or actively dating or having sex with anyone else.

**110.**   Walsh then lifted Lange's dress to look under it saying he wanted "a last look" and that he needed to "detox" from Lange.

**111.**   Lange was very upset by Walsh's words and actions.

**112.**   Lange reemphasized to Walsh that he was indeed free to be with anyone he wanted, as long as they were of age and consenting, but pursuing or having sex with multiple employees simultaneously put the company at enormous risk and was morally reprehensible.

**113.**   Walsh told Lange that she was "unhinged" and that there might have been a chance for them to be together in the future, but Lange ruined that by coming up with "crazy stories" when she imagined he was involved with the employee he was photographed with on July 12, 2023.

**114.** Lange and Walsh left the restaurant with no real resolution to any of the issues raised and began to argue on the street, which led to Walsh telling Lange it was all over, "the job, the champagne lounge, everything." Walsh also shouted, "It's done! We're done! All of it!" Lange said she would send Walsh a resignation if he really meant what he said.

**115.** The next morning, July 14, 2022, Lange called Walsh to apologize.

**116.** Lange decided to apologize because she was terrified of losing her job and feared that Walsh would retaliate against her professionally due to the argument. She decided that the best course of action was to push down her feelings of hurt and tell him that she was sorry.

**117.** Walsh did not answer the phone when she called him.

**118.** Later that morning, Johnathan Jenkins, TMPL's Director of Operations, called Lange to say that Walsh had called to tell him not to continue any work on the Champagne Lounge.

**119.** Jenkins was Lange's close friend and confidant throughout her employment with Defendants.

**120.** Upon information and belief, Walsh knew Jenkins would tell Lange about the instruction to cease work on the Champagne Lounge. Lange understood it to be a message for her to stop questioning Walsh if she wanted the Champagne Lounge to succeed.

**121.**   Later that afternoon, Walsh and Lange spoke by phone. Walsh said it was not healthy for him to have Lange at the company and that Lange's work was "clearly suffering" because she was hung up on their relationship.

**122.**   Lange disagreed and noted that she had not received negative feedback about her work before their conversation on June 12, 2022.

**123.**   Lange also pointed out that she worked an average of six days a week since September 2021 and had only taken three days of PTO since beginning as Brand Director.

**124.**   Walsh said Lange must resign from her consultant position at TMPL imminently if they were to move forward with the Champagne Lounge, and he could not have her "doing both jobs half-assed."

**125.**   Lange told Walsh she did not feel comfortable resigning until the Champagne Lounge was closer to opening, but Walsh insisted that it would be necessary.

**126.**   Lange experienced Walsh's insistence as retaliatory behavior in response to Lange's questioning of his conduct with female employees and also her recent questioning of the other concerning behaviors he was demonstrating.

**Changes to the Role of Brand Director**

**127.**   On Monday, July 18, 2022, two business days after the argument between Walsh and Lange, Molino contacted Lange before 9:00 a.m. to tell her that there would be changes to her role at TMPL.

128.     Molino told Lange that, moving forward, she would no longer report to Walsh and instead was required to report to Anthony Messina, the Vice President of TMPL, who Walsh knew had always treated Lange poorly.

129.     During the following week, Messina and Molino informed Lange that they were reviewing her responsibilities and had questions about the value of her contributions.  Lange was taken aback by this, particularly because the only other negative feedback she had received about her work as Brand Director was from Walsh during their recent arguments.

130.     Messina and Molino also told Lange that Defendants were rescinding the budgets that were previously approved for marketing campaigns and projects Lange had scheduled through the end of the year.

131.     Lange felt her work was being targeted unfairly and assumed the changes announced by Molino and Messina were due to her disagreements with Walsh. However, she tried not to think about that and focused on doing her job well in spite of the new limitations and budget restrictions.

132.     Lange also continued work on the Champagne Lounge.

133.     Over the next few days, Walsh did not say anything more to Lange about wanting her to resign.

134.     Lange hoped that her job was safe.

135.     On July 27, 2022, Walsh visited Lange at her apartment and presented her with a copy of the sublease agreement to open the Champagne Lounge within TMPL Lexington.

136.    Lange and Walsh signed the sublease agreement the evening of July 27, 2022 and also resumed their intimate relationship.

137.    Lange understood the signing of the sublease agreement to be an olive branch and show of good faith. This led her to believe that her conflict with Walsh had been resolved.

138.    Walsh had not repeated his instruction that Lange resign as Brand Director during any of their communication since July 14, 2022.

139.    Lange therefore believed their conflict was resolved and that she would be able to continue working as Brand Director.

140.    However, in mid-July 2022, during a training session, Walsh told another employee at TMPL that he was "trying to get rid of" Lange.

141.    Thereafter, on August 2, 2022, Messina emailed Lange with a new role description for Brand Director, which materially changed her responsibilities and effectively demoted her from a leadership position.

142.    In the new role description, Lange was given immediate hour-by-hour deliverables. The job change was effective immediately and Lange was told that she needed to comply in full to be able to continue as Brand Director.

143.    Up until then, Lange's work aligned with what she laid out in the KPI document upon transitioning into the consultant position. She did work for all five TMPL locations, attended offsite meetings, worked remotely on a regular basis, and had not received any negative feedback for doing so prior to this sudden change.

144.    The new role description for Brand Director required a 10:00 a.m. to 7:00 p.m. in-person schedule, Monday to Friday, at only two out of the five TMPL locations: TMPL West Village and TMPL Astor Place.

145.    Messina also told Lange she would have to cease her other work on the Champagne Lounge or complete it outside her new schedule.

146.    Messina and Molino told Lange she was expected to comply with the new Brand Director schedule because the same was being asked of Sydney Bakich, the Social Media Manager at PBSC. However, Lange's job as Brand Director was at the executive level, and Bakich's was not.  The micromanagement of Lange's role was inappropriate for her level in the company and no other executive level employees were held to such a strict schedule with such controlled deliverables.

147.    Other than Walsh, no other executive level employee was being required to work in person at a specific location on a daily basis. For example, Molino and Messina both worked remotely full-time from Florida.  In fact, Molino had not been to any TMPL gym location since the start of her employment with Defendants and Messina had not visited the TMPL gyms in months.

148.    It was also nonsensical to justify Lange's job changes by comparing her to Bakich because Bakich was not actually being held to the same standards or required to comply with the new in-person rule given to Lange.

149.    Bakich is an actress who was only working for Defendants part-time in August 2022. In fact, she was on-location filming a movie in the Pacific Northwest at the time.

**150.** Bakich was not working in person and upon information and belief, her absence was not penalized by Defendants.

## Lange Follows Walsh's Instructions and Resigns as Brand Director

**151.** Lange was distraught after receiving the new Brand Director role description and stepped outside of TMPL Astor Place to get some air after reviewing the document.

**152.** Jenkins happened to be outside when Lange stepped out and she began crying when she saw him. Jenkins told her to sit in his car around the corner and tell him what happened.

**153.** Lange showed Jenkins the email from Messina, and in response Jenkins suggested Lange resign from her position as Brand Director. He said she would probably be fired for insubordination and might as well get ahead of it and resign before she got fired. Lange said she could not resign unless she spoke with Walsh to get certain assurances from him.

**154.** Because Lange was so distraught, Jenkins offered to speak with Walsh about Lange's concerns and obtain the assurances she needed. He told her this was a big favor, but he was doing it for her as a friend.

**155.** While sitting in the car with Lange, Jenkins pulled out his cellphone, stepped out next to the car, and called Walsh directly.

**156.** Lange did not overhear Jenkins' side of the conversation with Walsh. However, when they hung up, Jenkins immediately reentered the car and recapped the discussion to Lange.

157.    Jenkins told Lange that if she resigned, Walsh would accept the resignation and continue compensating her for her work on the Champagne Lounge in advance of its expected opening in the fall of 2022. Jenkins also reported that Walsh agreed to increase his involvement with work on the Champagne Lounge over the coming weeks to try and accelerate the opening. Walsh also purportedly agreed to hire Lange to consult on future TMPL gym design and construction projects, as well as allow her to control the retail apparel operations for TMPL.

158.    Lange understood that Walsh would ensure that Lange got paid at least $8,000 per month to match the salary she was receiving from TMPL at the time.

159.    Although she felt uncomfortable and was under extreme duress, Lange agreed to resign as Brand Director that same day, August 2, 2022. However, she did continue to work for Defendants as a cycling instructor and personal trainer.

160.    Lange felt that she had no other choice but to resign as Brand Director and comply with the plan Walsh laid out via the call with Jenkins.

161.    Lange also resigned because she was relying on the promises Walsh made when he asked her to enter a business relationship with him. Lange believed that the Champagne Lounge would be opening within the next few months.

162.    Lange wrote a resignation email addressed to Walsh, but it was Molino who responded 20 minutes later saying, "So sorry to hear that the position is no longer working for you." Molino went on to say that TMPL accepted her resignation and that she would call Lange to facilitate a handover.

163.   Later in the afternoon of August 2, 2022, Walsh called Lange and told her that he was relieved she had resigned.

164.   Walsh told Lange he would visit the following week to celebrate and asked her to make a dinner reservation at either L'Artusi (the first place they had dinner together and where Walsh asked Lange to partner with him in the Champagne Lounge) or Marea (a favorite of theirs) for August 11, 2022.

165.   Walsh subsequently told Lange to cancel the reservation because he ate too much that week. He still visited but asked that they stay inside, so they spent the nights of August 10, and 11, 2022 at Lange's home.

166.   Immediately after this visit, Walsh began to walk back the promises he made to Lange the day she resigned as Brand Director.

167.   Despite previously promising to pay her a monthly salary, Walsh refused to pay Lange for work on the Champagne Lounge until their operating agreement for the Champagne Lounge was finalized. However, he was unavailable to work on finalizing the operating agreement whenever Lange tried to speak to him about it.

168.   Because Lange was not receiving the salary she had been promised, she did not have enough money to buy groceries, pay bills, or pick up her prescription medication by the middle of September 2022. Her bank account was also overdrawn.

169.   Lange told Walsh she was in a terrible financial position and asked why he was refusing to pay her the salary he had promised to pay.

170.   Walsh told Lange he could not be doing special favors for her.

**171.**   Walsh did not acknowledge that Lange was not requesting a special favor and instead requested that he comply with what he agreed to do.

**172.**    Walsh paid Lange $5,000 in late September and paid her another $5,000 in October 2022.

**173.**   Payment of $5,000 per month was $3,000 less per month than what Lange had expected to receive; she thought Walsh would match the $8,000/month salary she received as Brand Director.

**174.**   Walsh did not pay Plaintiff after October 2022.

**175.**   To date, Lange has not been contacted for project work at TMPL, despite Defendants securing a lease for a new location at 200 Madison Avenue in the first quarter of 2023.

**176.**   Upon information and belief, in or around September 2022, Walsh told the owner of a marketing agency in New York that he fired Lange from her role as Brand Director.

**177.**   Lange was forced out of her position as Brand Director at TMPL.

**178.**   The new role descriptions presented to Lange were mere pretext for retaliation against Lange because of the disagreements she had with Walsh in June and July 2022 when she raised concerns about his inappropriate interactions and possible sexual harassment of female employees.

## TMPL's New Brand Director Not Required to Comply With Job Duties Lange Had Been Told Were Non-Negotiable

**179.**   Days after Plaintiff's resignation, Defendants promoted Sydney Bakich to the role of Brand Director, a position she still holds to date.

180.   Bakich was promoted despite having significantly less work experience and relevant qualifications than Lange, and had never been to any of the TMPL gyms at the time of her promotion.

181.   Despite Lange being told she would be unable to fulfill the duties of the role without being present in person on a set schedule, when promoted to Brand Director, Bakich was living in, and continues to reside in Florida.

182.   Upon information and belief, Bakich has worked remotely throughout her entire tenure as Brand Director.

183.   Lange resigned under duress and was ready, willing, and able to carry out the responsibilities that Bakich is currently undertaking.

184.   Lange was constructively discharged from her employment as Brand Director.

## Walsh Begins Withdrawing From Involvement with The Champagne Lounge

185.   In or around mid-August 2022, shortly after Lange was forced to resign as Brand Director, she began having trouble reaching Walsh to discuss the Champagne Lounge.

186.   Walsh was repeatedly unavailable and unresponsive for days at a time, which impacted Lange's ability to meet deadlines for the Champagne Lounge.

187.   For example, Walsh had agreed to set up a bank account for Seven/Twenty Hospitality Group, LLC but failed to do so.  Lange opened it on August 19, 2022 after he put off doing so for approximately two weeks.

188.    When Lange contacted Walsh on August 19, 2023 to tell him about the bank account and other updates, he responded saying he could not talk due to poor cell phone service while fishing with his brother in Nantucket, Massachusetts.

189.    On August 23, 2022, Lange learned that Walsh was not in Nantucket, but instead vacationed in Puerto Rico and Ibiza, Spain while Lange was trying to contact him about time-sensitive business matters.

190.    She later learned that Walsh was vacationing in Ibiza, Spain with two female employees of PBSC.

191.    Lange was concerned by Walsh's unresponsiveness, particularly because she had just resigned from her position as Brand Director at Walsh's directive and based on the promise that they would work together to open the Champagne Lounge in the fall of 2022. If that fell through, Lange would be out of work.

192.    Walsh began a practice of regularly blocking Lange's number on his phone for varying periods of time, so he could be the only one to contact her if and when he chose to do so.

193.    Walsh also rarely responded to or confirmed receipt of emails from Lange.

194.    On August 29, 2022, Lange confronted Walsh about his poor communication throughout the month of August. He denied traveling to Spain and also denied doing anything to intentionally avoid communicating with Lange, confoundingly suggesting Lange was fabricating stories about his travels as a "ruse" to try to get out of proceeding with the Champagne Lounge.

**195.**   Lange felt mistrustful of Walsh but continued forward with the Champagne Lounge plans because she believed it had real potential for success and because she held what she believed to be a valid fully executed sublease for the space within TMPL Lexington.

**196.**   On September 7, 2022, Lange met with Walsh and presented him the full business plan, including detailed interior design plans, architectural plans and permit drawings, equipment list, confirmed producer for their house champagne label, a comprehensive timeline, cost, and projections for year one.

**197.**   Walsh approved the business plan and budget on the spot.

**198.**   On September 20, 2022, Lange, Walsh, and Jenkins met at TMPL Lexington and did a walk-through of the space where the Champagne Lounge would be built. They also reviewed the finalized budget, construction plans, and timeline for the grand opening of the Champagne Lounge.

**199.**   During the meeting, Lange told Walsh that she needed him to complete specific tasks to be able to submit the Champagne Lounge's liquor license application, which was necessary for the business to be operational.

**200.**   Walsh agreed to do what was needed to complete and submit the liquor license application.

**201.**   The next day, September 21, 2022, Lange and Walsh created and executed an operating agreement which further formalized the terms of their business partnership.

202.    According to the operating agreement, Walsh would provide an initial capital contribution of $85,000 to fund the first phase of the construction and set up costs incurred prior to the opening of the Champagne Lounge.

203.    However, Walsh did not follow through with his promises. He failed to complete the tasks needed for submission of the liquor license application and also failed to deposit the funds constituting the capital contribution for the Champagne Lounge.

204.    On October 12, 2022, Walsh and Lange spoke by phone and Walsh said the Champagne Lounge would have to be paused for six months because TMPL was in sudden financial distress, and he was personally funding the company to ensure its survival.

205.    Lange was disappointed by the news but remained optimistic, stating that it would likely take six months for full approval of the liquor license anyway. Lange also told Walsh she was willing and well-positioned to work with him to get TMPL back on track, as it had quickly deteriorated since her departure as Brand Director.

206.    Walsh agreed to produce the necessary bank statements to support the liquor license application weeks later after several unexplained delays. However, he failed to keep his word and do so.

207.    Nevertheless, Lange continued working on the portions of the liquor license application she could complete independently, along with other work for the Champagne Lounge throughout November 2022 and December 2022, despite

Walsh's repeated cancellations of meetings and refusal to participate in any meaningful discussion regarding next steps.

**Lange Confronts Walsh & He Officially Retracts Support for the Champagne Lounge**

208.   On December 19, 2023, Lange went to an OB-GYN appointment for her annual wellness visit with her doctor.

209.   Lange's doctor conducted a routine STD panel and two days later, on December 21, 2022, Lange received a positive result for syphilis, showing antibody levels indicative of a recent infection (contracted within weeks or recent months).

210.   Lange's only sex partner for the previous 11 months was Walsh, and they had never used protection.

211.   Lange contacted Walsh on December 21, 2022 telling him that she had been to the doctor and needed to speak with him as soon as possible.

212.   Walsh did not acknowledge or respond to Lange's message until he showed up at her apartment on December 23, 2022 and at that time, Lange told him about the syphilis diagnosis.

213.   Walsh initially responded appropriately and seemed to take the news seriously, but then commented it was a "turn on" knowing no one else could have Lange but him until her treatment protocol was completed. He attempted to have sex with Lange but she refused. Although they did not have sexual intercourse that day, they were sexually intimate.

214.   Walsh later told Lange he got tested in Florida on Monday, December 26, 2022, the day of his 47th birthday.

**215.**    Lange attempted to follow up several times in the subsequent days asking about Walsh's STD test results but found he had once again blocked her number and she had no means of communicating with him except via email. For nearly two weeks he said the results were not ready which surprised Lange because her results were available within 48 hours.

**216.**    Lange told Walsh to please tell her what his results were as soon as he got them because his results could influence her treatment protocol. If he told her that he got a negative result that would mean she probably had a false positive result. Lange would have gotten retested and might have been able to stop her intense and painful treatment regimen early.

**217.**    On January 8, 2023, Walsh called Lange. He said he had no news on the STD test, made no mention of the syphilis diagnosis, but stated that the Champagne Lounge was no longer a viable business due to financial constraints affecting TMPL and his own personal finances, stating the situation was so dire, he needed to move out of his house to rent it for extra income.

**218.**    Walsh said he had to "de-risk" and stopping work on the Champagne Lounge was necessary for TMPL to keep its doors open.

**219.**    Lange asked Walsh for more information about the decision to de-risk but Walsh did not respond.

**220.**    On January 10, 2023, Lange and Walsh spoke on the phone. Initially, the conversation was meant to be an update on the Champagne Lounge and Lange's concerns about her professional future.

221.   When the conversation became argumentative, Walsh changed the subject, saying he had just received the results minutes earlier, and they were negative.

222.   Walsh refused to send Lange a copy of the test results, telling her she could see them later that month in person.

223.   Lange did not believe Walsh was telling the truth.

224.   Lange also told Walsh he was jeopardizing her health, her career, and the future of his businesses with his negligence and reckless behavior.

225.   In response, Walsh told Lange her help was "no longer wanted or needed" at TMPL.

226.   Later that day Lange wrote Walsh an email explaining that, regardless of his STD test results, which she still did not believe to be negative, they had sexual contact on December 23, 2022, and he needed to take necessary precautions and follow up with additional testing and/or treatment.

227.   Walsh did not respond.

**Walsh Fraudulently Induces Lange to Resign As Brand Director and Work on Champagne Lounge Which He Did Not Intend to Fund**

228.   Lange reasonably believed that the sublease she held for the Champagne Lounge was valid because it appeared to contain all the standard terms required for the leasing of a commercial space, had identifying information about the Champagne Lounge, and was signed by both Walsh and Lange on July 27, 2022.

229.   Since Walsh is a seasoned businessperson, Lange also reasonably relied on Walsh's assertions that the sublease gave them the right to build out and operate the Champagne Lounge at TMPL Lexington.

230.    Therefore, when Lange was forced to resign from her job as Brand Director on August 2, 2022 (less than a week after having signed the sublease), she relied on Walsh's assurances that he would pay her salary in the short term and they would open the Champagne Lounge in the fall of 2022.

231.    However, Walsh knew that they would not be opening the Champagne Lounge because he knew that the sublease he and Lange signed was not valid.

232.    The sublease had not been issued by or approved by Boston Properties, TMPL Lexington's landlord whose standard policy is not to allow tenants to unilaterally authorize subleases.

233.    Upon information and belief, Walsh was aware that Boston Properties needed to approve the Champagne Lounge subleases in order for it to be valid, but he did not present it to anyone at Boston Properties for approval.

234.    Lange was unaware of the requirement that Boston Properties approve the sublease and relied on Walsh's word.

235.    Walsh also decided not to provide the capital necessary to fund the operations of the Champagne Lounge but did not tell Lange until after she stopped working as Brand Director.

236.    Walsh wanted Lange out of her job as Brand Director, as confirmed by the statement he made to the TMPL trainer about wanting to "get her out."

237.    Walsh used the false promise of the Champagne Lounge to get Lange to leave her employment.

36

238.    Walsh fraudulently induced Lange to leave her job as Brand Director to work on the Champagne Lounge, which could not possibly become operational without a valid sublease agreement or capital contributions.

239.    Lange's reliance on Walsh's false assurances and fraudulent inducement resulted in her resignation from the job of Brand Director and left her without a guaranteed salary or adequate income.

**Walsh Engages In Questionable Financial Decisions and Casts Doubt on His Claims of Financial Hardship**

240.    Lange was confused by Walsh's decision to withdraw from their business partnership due to alleged financial troubles because in contrast to his claims of financial hardship, she witnessed him spending significant amounts of money freely.

241.    Walsh purchased and renovated four condominiums in Palm Beach County totaling approximately $3 million, plus renovation costs, in 2022 and, upon information and belief, a female employee of PBSC began residing in one of them within two weeks of its purchase.

242.    In addition to his vacations to Ibiza and Puerto Rico during August 2022, Walsh traveled to London and Paris in December 2022, just days after laying off several employees purportedly due to poor financial performance of the company.

243.    In December 2022 Walsh stayed at the Connaught Hotel London and Ritz Paris, five-star hotels with room rates that typically cost over $1,000 per night.

244.    Walsh took a ski trip to Deer Valley, Utah in March 2023, traveled to Greece and Italy in July 2023, notably staying in the villa at the Grace Hotel in Santorini, with a nightly rate beginning at $8,000.

245.    Upon information and belief, Walsh has purchased tickets and had female employees join him during much of his travel from 2022 to present, and, upon further information and belief, regularly expenses entertainment for them.

246.    Furthermore, in October 2022, when Walsh first mentioned pausing work on the Champagne Lounge, Reuters reported that he is the third largest investor in Truth Social, the media company launched by former U.S. President Trump in 2021. Walsh reportedly personally invested $6.2 million.[4]

247.    In February 2023, Walsh began regularly traveling to New York from Florida with several female employees of PBSC simultaneously.

248.    Lange could not reconcile Walsh's claims of financial strife with the evidence of his lavish spending.

249.    Walsh's claim that he moved out of his house to make one month of rental income to save his own financial position and/or the company lacks credibility.

250.    Lange also questioned Walsh's motives because he withdrew all involvement in the development of the Champagne Lounge days after she told him that he was making poor business decisions, having reckless unprotected sex and not taking

---

[4] Helen Coster and Krystal Hu, *Who funded Trump's Truth Social?*, REUTERS (October 28, 2022), https://www.reuters.com/technology/who-funded-trumps-truth-social-some-answers-2022-10-28/.

accountability for it, and pressed him for further explanations on how it could be possible that he was on the verge on financial collapse.

**Lange Seeks Advice From Her Personal Training Manager & Receives Confirmation of Walsh's Misconduct**

251.    Alex Hessam is the Fitness Manager at TMPL Hell's Kitchen and was Lange's manager as a personal trainer.

252.    On January 13, 2023, Lange met with Hessam to discuss the possibility of taking on new training clients. Lange had previously reduced her personal training schedule to accommodate the time constraints of her role as Brand Director but having been forced to resign and with Walsh describing the Champagne Lounge as "no longer viable", she needed more income.

253.    While discussing her interest in taking on more clients and in response to Hessam's questions, Lange explained the recent changes to her employment and told Hessam that she was fearful that Walsh was retaliating against her. Lange also disclosed that she had been in a relationship with Walsh and she felt her professional status was being affected by her questioning of his conduct.

254.    In response, Hessam said to Lange, "I'm going to say this to you three times, so you know what I'm saying is true. None of it was real, none of it was real, none of it was real."

255.    Lange, taken aback, asked Hessam what he meant by those words, was he referring to the Champagne Lounge or her relationship with Walsh wasn't real. Hessam responded, "none of it was real" and told Lange he believed Walsh was seeing someone in Florida.

256.   Hessam then said that Walsh was known to ask out every female employee he sets his sights on, and the ones that agree to go to dinner with him, "he fucks."

257.   Hessam also told Lange that Walsh often made big promises to the women that work for him and then asked Lange how she thought Walsh might feel if something happened to her and she was no longer around to present a problem for him. Hesam asked, "Would he be sad, or would he be relieved?

258.   Lange was extremely disturbed after this conversation. She confided in her friend, Jenkins, and told him she was devastated that all of her suspicions about Walsh's misconduct were likely true and that Walsh never intended to take their business partnership seriously.

259.   To Lange's surprise, Jenkins told her she shouldn't have told Hessam such personal things and that employees at TMPL were starting to "talk" and that he did not want Lange's positive reputation at the company to be tarnished because of gossip.

260.   Jenkins also said he didn't understand why Lange was trying to hurt Walsh, a statement which confused Lange. She said she had no intention of hurting Walsh-- in fact, it was Walsh who was causing her harm, and she was desperately trying to be heard and find support during this challenging time.

261.   Lange felt let down by Jenkins who purported to be her close friend and supporter.

262.    Upon further information and belief, Jenkins later confronted Hessam about his meeting with Lange and reprimanded him for speaking negatively about Walsh's conduct.

### A Personal Trainer at TMPL Confides In Lange That Walsh Has Been Sending Inappropriate Photos And Messages To A Female Employee

263.    On January 19, 2023, Lange was using the sauna at TMPL Lexington following a cycling class that she had taught.

264.    Another TMPL employee, a personal trainer, was also in the sauna and asked Lange why she was no longer Brand Director. Lange said she could not speak about it in detail and all she could say was that she had to resign.

265.    The trainer asked if Lange resigned because of "how the CEO is."

266.    Lange asked what he meant by that question and the trainer explained that a female employee showed him and several colleagues the messages that Walsh had been sending to her.

267.    Lange inquired as to the nature of the messages and the trainer said the messages were "gross." He also said that the female employee was very uncomfortable receiving them but was afraid to report it out of fear of losing her job.

268.    Lange later learned that one of the "gross" messages was of Walsh asking the female employee to send him photos of herself in the spa. He also wrote to the female employee that he wanted "an exclusive on all of your hot pics."

269.    The trainer went on to say that everyone assumed Lange quit, because they guessed that Walsh was similarly harassing her.

270.    This was the first conversation Lange had ever had with the trainer.

**Lange Contacts Human Resources & Is Retaliated Against For Doing So**

271.    Following the conversations with Hessam and the personal trainer, Lange decided to speak with Molino and scheduled a call for January 23, 2023.

272.    Lange also sought guidance about having the Seven/Twenty Hospitality Group, LLC sublease validated and explained that she was seeking new investors for the Champagne Lounge since Walsh said that he could not proceed with its funding.

273.    Molino said she could not help with anything related to the Champagne Lounge.

274.    During that same conversation, Lange disclosed her intimate relationship with Walsh and expressed concerns that he was engaging in discriminatory and retaliatory behavior towards her.

275.    Lange also told Molino that she believed Walsh to be romantically involved with an employee in Florida and that his behavior towards Lange may have changed after that relationship began and Lange questioned him about it.

276.    In response, Molino stated that company policy does not prohibit romantic relationships between consenting adults.

277.    Lange pointed out that this was not a question of consent, but rather of retaliation and a hostile work environment.

278.    Lange then told Molino that a personal trainer at TMPL confided in Lange about Walsh sending a female employee inappropriate messages and photos.

279.    Molino told Lange that she would investigate the claims.

280.   Thereafter, Molino spoke with Lange via conference call on January 30, 2023 to inform her that she completed the investigation, identified and reviewed the messages in question, and found no evidence of inappropriate behavior.

281.   Molino wrote a follow up email on February 2, 2023 stating, "We acknowledge the complaint you made on January 23, 2023. After thorough investigation, we found no violation of company policies. This matter is closed."

282.   Molino did not provide any further written information and there is no evidence that an actual investigation was conducted in the 7 days between Lange's complaint and Molino's response.

283.   Upon information and belief, neither Molino nor any other TMPL employee, interviewed the female employee that Walsh had texted requesting she send him, among other things, "hot pics."

284.   Lange was not asked to provide any additional details, and no support or guidance was provided to Lange after she shared concerns and allegations of misdeeds by the owner of the company.

285.   Furthermore, during the same call on January 30, 2023, Molino informed Lange about a complaint that had supposedly been lodged against her by a manager at TMPL who allegedly complained about feeling uncomfortable when Lange spoke to him about her relationship with Walsh.

286.   Upon information and belief the manager in question was Hessam.

287.   Molino told Lange that she was not to speak to employees about personal relationships.  And via email on February 2, 2023 she wrote, "Regardless of whether

you are on the clock, you are an employee of TMPL, and these conversations should not take place between coworkers while in the clubs. We ask that all persons working in the Clubs, both employees and independent contractors, refrain from engaging in conversations about their personal relationships and other topics that may not be appropriate for work."

288.    Lange had spoken truthfully to Hessam, responding to questions he asked her about the status of the Champagne Lounge and her former role as Brand Director.

289.    Weeks later Lange spoke to Hessam about the alleged complaint, and he unequivocally stated that he had not proactively complained about Lange to Molino, but that TMPL leadership contacted him to ask about the conversation he had with Lange and encouraged him to make a complaint against her.

290.    Upon information and belief, Molino coerced the claim Hessam made against Lange.

291.    Lange was penalized for speaking to her manager and to Molino about her legitimate concerns and the impact of Walsh's actions on her career.

292.    As a result, Lange felt afraid to speak with anyone else at TMPL about her work, about Walsh, about the Champagne Lounge, and about the circumstances surrounding her forced resignation.

293.    Molino's actions in response to Lange's communication with Hessam and herself are further evidence of a hostile work environment and retaliatory behavior taken against Lange by Defendants.

**Defendants' Retaliatory Actions Towards Lange After the Filing of Lange's
EEOC Charge**

294.    After months of non-communication, Walsh began following Lange on TikTok

and began sending direct messages via Instagram in early May 2023, less than two

weeks after the filing of Lange's EEOC Charge against Defendants.

295.    Lange encountered Walsh in person for the first time after the filing of the

EEOC Charge on May 15, 2023 when he approached her on the street while she was

talking with Jenkins near TMPL Hell's Kitchen.

296.    Walsh told Lange he wanted to speak with her privately and Lange said no,

they couldn't be speaking because of the legal situation and their attorneys would

not want them to be communicating privately.

297.    Walsh claimed to be unaware of any legal action Lange was taking against

him.

298.    Lange began walking home and Walsh followed her, asking to please let him

speak with her.  He also said that he missed her very much and he wanted to

restart their romantic relationship.

299.    The next day, Walsh explicitly requested that Lange cease all legal action

against Defendants.

300.    Lange refused to do so.

301.    Walsh continued to contact Lange and visit her home (often unannounced)

nearly every time he visited New York between May 2023 and September 2023,

with the last visit occurring less than a week prior to the filing of the instant

Complaint.

302.    Walsh also called Lange frequently when in New York, sometimes multiple times a day, from May through August 2023.

303.    Walsh and Lange's intimate relationship resumed on May 15, 2023 and continued throughout the end of August 2023.

304.    During nearly every visit, Walsh requested that Lange cease her legal proceedings and asked to settle their differences privately, without legal counsel. Lange refused to do so.

305.    During more than one visit Walsh also expressed remorse for "killing the Champagne Lounge" and claimed he did so because he got scared.

306.    On July 18, 2023, Lange was taking the train to JFK Airport to board a flight to Indonesia when she saw Walsh had called her twice. When Lange returned his call, Walsh asked Lange to change her flight to the next day and spend the night with him. Lange said no.

307.    Walsh's initial apologetic tone shifted as time went on. His growing frustration with Lange's lack of cooperation with his request to cease legal action became apparent in his comments to Lange. For example, Walsh told Lange that her claims had no merit, that she would lose in court, that a lawsuit would destroy her reputation, and that he would file multiple lawsuits against her if she proceeded with a court filing.

308.    Lange pointed out to Walsh that her claims had nothing to do with the countersuits he threatened and said he could file them regardless of the legal action she took. In response Walsh remarked that he thought Lange was smart enough to

know that he would not proceed if she ceased legal action, and that he can "play the game too."

**309.**   Walsh's threats of legal action against Lange were purely retaliatory and served to intimidate and silence Lange.

**Lange's Final Resignation From Work at TMPL**

**310.**   Although Lange had been forced to resign as Brand Director months prior, she still taught fitness classes and worked as a personal trainer at TMPL.

**311.**   On June 21, 2023, Walsh confronted Lange when she arrived at TMPL Lexington to teach a class.

**312.**   Walsh approached Lange on the stairs, asking her if she had anything to say for herself. He told her she had no case and she was humiliating herself.

**313.**   Lange told him that she had to go teach her class.

**314.**   The confrontation left Lange feeling very distressed. She was troubled by the fact that Walsh spoke about the details of this private legal matter openly in a public setting, and that he felt he had the right to have access to Lange in her workplace.

**315.**   Lange was uncomfortable working for Defendants any longer and gave notice that she was resigning on June 22, 2023.

**316.**   Lange's reluctant decision to stop working as a cycling instructor and trainer in June 2023 marks the third time that she was forced to resign from her work at TMPL due to Defendants' actions.

**Walsh's Intimidation Tactics Continue**

317.    Consistently from May through September 2023 when the instant Complaint was filed, Walsh attempted to intimidate Lange and stop her from exercising her legal right to file claims against Defendants.

318.    In a seeming effort to stop Lange from proceeding with legal action against Defendants, Walsh repeatedly told Lange that they should keep their legal and personal matters separate and that he wanted to work toward rebuilding trust in their relationship.

319.    During a conversation in July 2023, Lange told Walsh it was difficult for her to believe that he was sincerely interested in rebuilding trust and having a future together when he had just returned from a vacation to Italy and Greece with a female PBSC employee.

320.    Walsh categorically denied ever having gone on vacation with the employee, to Greece or anywhere else.

321.    When Lange told him she saw photos from the trip, Walsh then denied having been in Greece at all, suggesting instead that his daughters were there with his ex-wife because they have Greek family lineage.

322.    Lange told Walsh that there were many photos documenting the vacation to Greece on social media clearly showing Walsh, the PBSC employee, and his children together. She also showed one of the photos to Walsh.

323.    Walsh said the image must have been AI-generated and then said, "I don't know why you're bringing my personal life into this".

**324.**   Lange reminded Walsh that their conversation was inherently linked to his credibility and  if Walsh was outright denying something so clearly straightforward and easily-proven as his travel to Greece, it was unlikely she could believe him about anything else.

**325.**   Walsh responded, "I see your point."

**326.**   The following day, all photos of the PBSC employee were removed from Walsh's daughters' social media accounts.

**327.**   Although she was still hesitant, Lange began to believe Walsh had sincere intentions, and allowed him to visit her throughout the second week of August 2023.

**328.**   Her belief in Walsh's sincere intentions quickly came to an end after she received a phone call from Walsh on August 10, 2023.

**329.**   Walsh contacted Lange at approximately 10:00 A.M. to inform her that she might receive a visit from the New York Police Department ("NYPD") and went on to explain that he had overslept and missed a morning meeting, which Jenkins was supposed to pick him up for.

**330.**   Walsh told Lange that Jenkins couldn't contact him because his phone was off. According to Walsh, Jenkins then found the superintendent at Walsh's apartment building, who purportedly gave Jenkins entry into Walsh's apartment.

**331.**   According to Walsh, Jenkins saw the television was on and Walsh's belongings were there, but Walsh was not.  Jenkins then called the NYPD and said he was afraid Lange may have caused harm to Walsh, and gave them her address.

332.    Jenkins' statements to the police had no basis in reality. In fact, Walsh had fallen asleep at his brother's apartment the previous night. Upon information and belief, he missed Jenkins' calls and the meeting because his phone was not charged and he overslept.

333.    Lange was devastated to learn that Jenkins, who she had previously counted as a close friend and confidant, called the police and accused her of possible criminal activity.  Lange felt betrayed and was incredibly fearful for her safety.

334.    Fortunately, the NYPD did not go to Lange's home that morning.

335.    Jenkins made a frivolous and false call to the NYPD which potentially diverted resources and attention away from actual criminal matters and put Lange in potential danger.

336.    On August 11, 2023, counsel for Walsh at Blank Rome LLP, attempted to explain away Jenkins' call to the police stating the following via email:

337.    Mr. Jenkins contacted the authorities for a wellness check after his repeated attempts to contact Mr. Walsh yesterday morning went unanswered and after Patrick missed a business meeting (Patrick has never missed a meeting).

338.    We understand from what your client indicated to Mr. Jenkins that she needed therapy after she tried to kill herself, so Mr. Jenkins was reasonably concerned for Patrick's well-being.

339.    Jenkins' claim that Lange engaged in self-harm is entirely false and potentially defamatory.

**340.**   Jenkins' phone call and accusation have had lasting negative effects on Lange and caused extreme emotional distress.

**341.**   Jenkins was acting as an agent for Defendants when he called the NYPD.

**342.**   Lange understood Jenkins' call and the subsequent false statements about her mental health to the police to be a threat and warning to keep her from proceeding with legal action.

**343.**   Ironically, less than 36 hours before the false police call was made, Walsh visited Lange's home after 11pm on August 8, 2023. Walsh was visibly intoxicated and emotionally agitated, with wine spilled down the front of his clothing. Lange told Walsh he couldn't enter her home. Walsh entered despite being told to leave.

**344.**   Walsh told Lange he hated her and she was a disgrace. He then asked Lange if she could please lay next to him and rub his head.

**345.**   Lange told Walsh his behavior was harmful to both of them and told him that he needed to leave.

**346.**   Instead, Walsh walked back to Lange's bedroom and fell asleep immediately on her bed.

**347.**   Lange did not want to agitate Walsh further, and let him sleep in her bed, while she lay awake for most of the night on the sofa.

**348.**   Jenkins' call to the police was particularly inappropriate because just one day prior Lange demonstrated that even at times when Walsh displayed no capacity for compassion or decency towards her, Lange was a safe haven for him.

**Walsh's Offer to Lange In Exchange For Settlement**

349.   Walsh last visited Lange in her home on August 22, 2023 and at that time told Lange he had a proposal for her which consisted of investing in her hospitality company in exchange for a minority ownership stake, giving Lange full control and veto power. Walsh told Lange he wanted to offer this as an alternative to settlement of Lange's claims against Defendants, and exchange for her ceasing legal action.

350.   Lange asked Walsh how much he wished to invest. He said he had not thought about an amount.

351.   Lange told Walsh that his offer felt insincere, as he was aware the deadline for her to file a Complaint in federal court was less than three weeks away.

352.   Walsh pleaded with Lange to consider his offer and vowed to continue making efforts to demonstrate his sincerity and seriousness.

353.   However, he failed to offer any actual monetary terms for the proposed investment offer.

354.   Upon information and belief, the offer was not made in earnest, and was yet another egregious attempt to emotionally manipulate and coerce Lange into accepting a false opportunity.

**The Effects on Plaintiff**

355.   Lange has suffered substantial emotional distress as a result of Defendants' acts and omissions alleged herein, and discussed the emotional impact of Defendants' conduct with her psychotherapist.

356.    Lange has been diagnosed with most of the classic symptoms of post-traumatic stress disorder as a result of the Defendants' acts.

357.    As a result of Defendants' actions, Lange has suffered and will continue to suffer the loss of income, the loss of salary, bonuses, benefits, and other compensation related to her employment.

358.    As a result of Defendant's actions, Plaintiff has suffered from depression, anxiety, a sense of despair, social withdrawal, inability to focus, and hopelessness. Lange has also experienced a negative change in her eating and sleeping habits, and has been suffering with persistent feelings of fear of trusting others, and emotional anguish after being psychologically abused for an extended period of time.

359.    Lange has also suffered a loss of income due to Walsh's fraudulent inducement. Lange believed that she and Walsh were going to work together to open the Champagne Lounge when in fact, Walsh had no intention of doing so and gave Lange an invalid sublease which she relied upon.

360.    Lange has also suffered damage to her professional reputation due to Walsh's fraudulent inducement. Lange had already secured buy-in by several key stakeholders who pledged their support to the project by October 2022. Lange built these professional connections over years through her pristine professional reputation, strong work ethic, and integrity. Left without any answer to provide these stakeholders on the status of the project, but still trying to save face for

Walsh, Lange lost professional credibility with many connections she spent years fostering.

**361.** Plaintiff has also suffered damage to her professional reputation due to Walsh's disparaging comments to other employees, who believed Lange was directly demoted by Walsh because of what he told them himself about wanting to "get her out".

**362.** Further, Plaintiff has suffered damage to her professional and personal reputation due to her forced resignation from the Brand Director position and subsequent constructive discharge from her employment as trainer and cycling instructor.

## FIRST CAUSE OF ACTION
### Retaliation In Violation of Title VII

**363.** Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**364.** By the acts and practices described herein, Defendants have retaliated against Plaintiff for her opposition to sexual harassment in the workplace and in doing so, Defendants acted in violation of Title VII.

**365.** Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and by constructively discharging her on the basis of her protected activities, in violation of Title VII.

**366.** Such retaliatory treatment would dissuade any reasonable employee from making a or supporting a similar statement in opposition to sexual harassment.

**367.**   Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

**368.**   Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**369.**   Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, postjudgment interest, attorneys' fees, costs and disbursements.

## SECOND CAUSE OF ACTION
### Retaliation In Violation of the NYSHRL

**370.**   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**371.**   Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and by constructively discharging her on the basis of her protected activities, in violation of NYSHRL.

**372.**   Such retaliatory treatment would dissuade any reasonable employee from making a or supporting a similar statement in opposition to sexual harassment.

**373.**   Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

**374.**   Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**375.**   Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, postjudgment interest, attorneys' fees, costs and disbursements.

## THIRD CAUSE OF ACTION
### Retaliation In Violation of the NYCHRL

**376.** Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**377.** Defendants unlawfully retaliated against Plaintiff in the terms and conditions of her employment and by constructively discharging her on the basis of her protected activities, in violation of NYCHRL.

**378.** Such retaliatory treatment would dissuade any reasonable employee from making a or supporting a similar statement in opposition to sexual harassment.

**379.** Defendants' unlawful retaliatory acts caused Plaintiff to suffer economic damages, including lost wages as well as emotional distress damages.

**380.** Defendants acted willfully, with malice and/or reckless indifference to Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

**381.** Defendants are liable to Plaintiff for back pay, front pay, emotional distress and other compensatory damages, punitive damages, prejudgment interest, postjudgment interest, attorneys' fees, costs and disbursements.

## FOURTH CAUSE OF ACTION
### Violation of the FIFA (N.Y.C. Admin. Code § 20-928)

**382.** Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**383.** In the circumstance that Plaintiff is determined to not have been an employee of Defendants when she was forced to resign and work as a contractor, Plaintiff was a contractor and "freelance worker" within the scope of FIFA.

384.   Defendants were "hiring parties" within the scope of FIFA.

385.   As the value of the work performed by Plaintiff for Defendants' benefit exceeds $800 in value, Defendants were required under FIFA to provide Plaintiff a written contract that included, among other things, "an itemization of all services to be provided" by Plaintiff, "the value of the services to be provided," "the rate and method of compensation" to be provided to Plaintiff and the date on which Defendants were to pay Plaintiff, or in the absence of such a date, "the mechanism by which such date will be determined."

386.    However, Defendants willfully violated their obligations to provide Plaintiff with such a written contract for her work.

387.   85. As a direct and proximate cause of Defendants' violation of FIFA § 20-928, Plaintiff has suffered damages, entitling Plaintiff to, among other things, statutory damages of $250.00, attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### Violation of the FIFA (N.Y.C. Admin. Code § 20-929)

388.   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

389.   Under FIFA, in the absence of a written contract, Defendants were required to pay Plaintiff for her work no later than 30 days after the completion of her work.

390.   Here, at the latest, Plaintiff's work for Defendants regarding the Champagne Lounge was completed in January 8, 2023, the date on which Defendant Walsh informed Plaintiff that the Champagne Lounge was no longer a viable business.

**391.**   To date, Defendants have not compensated Plaintiff for any of the work that she performed for the Champagne Lounge after October 31, 2022, such that they have willfully violated their obligation to timely provide Plaintiff with compensation in violation of FIFA § 20-929.

**392.**   As a direct and proximate cause of Defendants' violation of FIFA § 20-929, Plaintiff has suffered damages, entitling Plaintiff to, among other things, damages equal to two times value of the work performed by Plaintiff, attorneys' fees and costs.

**SIXTH CAUSE OF ACTION**
**Violation of the NYLL - Whistleblower Retaliation**

**393.**   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**394.**   By threatening to report Defendant Walsh's sexual harassing behavior, thereafter reporting it to her manager and Human Resources, and then by filing a Charge with the EEOC identifying Defendant Walsh's unlawful behavior, Plaintiff disclosed to a supervisor and a public body an activity, policy or practice of the employer that she reasonably believed was in violation of law, rule or regulation within the meaning of NYLL § 740(2)(a).

**395.**   Defendants retaliated against Plaintiff, in violation of NYLL § 740(2)(a) by taking adverse action, penalizing, constructively discharging, and threatening to take such actions that would adversely impact Plaintiff's current or future employment.

**396.**   As a direct and proximate result of Defendants' willful and unlawful conduct in violation of the NYLL, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to recover from Defendants, jointly and severally, all appropriate damages, including front pay, lost wages and benefits, punitive damages, reasonable attorneys' fees, and costs of the action.

### SEVENTH CAUSE OF ACTION
### Fraud & Fraudulent Inducement

**397.**   Plaintiff repeats and realleges all foregoing paragraphs as if fully set forth herein.

**398.**   Defendant Walsh misrepresented the validity of the sublease presented to Plaintiff for the Champagne Lounge. Specifically, Defendant Walsh presented the sublease as a valid document and executed it with Lange.

**399.**   At the time Defendant Walsh made these false representations to Plaintiff, he knew them to be false and knew that Plaintiff understood his false representations to mean she held a valid sublease to be able to proceed with the opening of the Champagne Lounge within an estimated three months of the signing of the sublease.

**400.**   Defendant Walsh made this misrepresentation to induce Plaintiff to resign from her job as Brand Director.

**401.**   Plaintiff reasonably relied upon Defendant Walsh's knowing and repeated (mis)representations in agreeing to leave her employment as Brand Director and work towards opening the Champagne Lounge for approximately five months.

59

**402.**   Had Plaintiff known that Defendant Walsh's representations were false and fraudulent, Plaintiff never would have agreed to resign from her job as Brand Director.

**403.**   As a result of the Defendant Walsh's knowingly false and fraudulent misrepresentations and Plaintiff's reliance thereupon, Plaintiff has suffered damages in an amount to be determined at trial, together with prejudgment interest, postjudgment interest, attorneys' fees, costs and disbursements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

a) declare Defendants' conduct complained of herein to be in violation of Plaintiff's rights under the Title VII, the NYSHRL, the NYCHRL, the FIFA and the NYLL;

b) awards monetary damages to Plaintiff to compensate her for the retaliation she experienced, including economic damages and damages for emotional distress;

c) award compensatory damages to Plaintiff to compensate her for the fraud and fraudulent inducement she experienced;

d) grant judgment to Plaintiff on her Title VII, NYSHRL, NYCHRL, and FIFA claims and award Plaintiff all appropriate relief to which she is entitled;

e) award Plaintiff punitive damages pursuant to Title VII, NYSHRL, and the NYCHRL;

f) award Plaintiff all other damages to which she is entitled;

g) award Plaintiff reasonable attorneys' fees and costs in this action; and

h) grant such other relief as this Court deems just and proper.

<u>**DEMAND FOR TRIAL BY JURY**</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

FRONTERA LAW PLLC

_____

Laura Rodríguez
411 Theodore Fremd Avenue
Suite 235
Rye, New York 10022
(914) 873-4388
lrodriguez@fronteralawfirm.com
*Attorneys for Plaintiff*

Date: September 12, 2023