UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/10/2025_

MEGAN LANGE,

                Plaintiff,

        -against-

EMPIRE HOLDINGS AND INVESTMENTS, LLC et al.,

                Defendants.

23-CV-08052 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

       Plaintiff Megan Lange ("Plaintiff" or "Lange") brought this action against her former employers, including her former intimate partner, asserting claims of retaliation, fraud, and wage violations. In the First Amended Complaint, *see* Dkt. No. 21 ("First Amended Complaint" or "FAC"), Lange brought ten claims against Defendants Empire Holdings and Investments, LLC ("Empire"); TMPL Lexington LLC d/b/a TMPL Lexington ("TMPL Lexington"); Empire Hells Kitchen TMPL LLC d/b/a TMPL Hell's Kitchen ("TMPL Hell's Kitchen"); JI Fitness LLC; and Patrick Walsh ("Walsh") (collectively, "Defendants")[1] for: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964; (2) retaliation in violation of the New York State Human Rights Law ("NYSHRL"); (3) retaliation in violation of the New York City Human Rights Law ("NYCHRL"); (4) whistleblower retaliation in violation of the New York Labor Law ("NYLL"); (5) fraud and fraudulent inducement; (6) failure to pay minimum wages in violation of the Fair Labor Standards Act ("FLSA"); (7) failure to pay minimum wages in violation of the NYLL; (8) failure to provide wage statements in violation of the NYLL; (9) failure to provide wage notices in violation of the NYLL; and (10) failure to pay timely wages in violation of the NYLL.

---

[1] Lange also brought claims against JI Communications LLC but has since voluntarily dismissed that defendant. *See* Dkt. No. 46.

Before the Court are Defendants' motion to dismiss and to compel arbitration. For the reasons discussed below, the motion to dismiss is GRANTED, the motion to compel arbitration of the fraud claims is GRANTED, and Plaintiff's request for leave to amend her labor law claims is GRANTED.

## BACKGROUND

### A.    FACTUAL BACKGROUND[2]

Defendants own and operate multiple luxury fitness centers, including various TMPL clubs in New York ("TMPL"), where Lange worked. FAC ¶ 1. Walsh is the CEO of Empire, which is the parent company of TMPL Lexington and TMPL Hell's Kitchen. *Id.* ¶¶ 2, 27–28, 47. JI Fitness LLC, in turn, is the parent company of Empire. *Id.* ¶¶ 43–45.

Lange began working for Defendants in 2018, first as a cycling instructor and then as a personal trainer, while at times also working as a marketing director and brand strategist. *Id.* ¶ 3. She first met Walsh in July 2021 and was promoted by him to TMPL Brand Director in August 2021. *Id.* ¶¶ 69–70, 73. Walsh pursued a romantic and sexual relationship with Lange; though Lange initially declined Walsh's advances, the two began a consensual dating relationship in or around October 2021. *See id.* ¶¶ 88–95. Walsh told Lange that there was no professional conflict or TMPL policy against them dating, but also told her that he did not want anyone at TMPL to know about their relationship. *Id.* ¶¶ 91, 96. Lange agreed not to tell any other TMPL employees about the relationship. *Id.* ¶ 96.

---

[2] The factual background that follows is taken from the FAC, which the Court will assume to be true for purposes of resolving the motion to dismiss.

### 1.    Lange's Shift from Employee to Consultant

Walsh told Lange on or around March 18, 2022 that they should "take a break from dating because he believed they needed to prove their working relationship was not dependent upon their romantic relationship." FAC ¶ 97. Lange was "disappointed" but agreed. *Id.* ¶ 98. On or around April 4, 2022, Walsh told Lange that if she resigned as an employee and instead worked full-time as a consultant for TMPL, with the same title of Brand Director and the same responsibilities and pay, they could openly date. *Id.* ¶¶ 99–102, 107. Walsh told her that it was against company policy for him to have a relationship with an employee, and that her professional credibility could be called into question if they dated while she was an employee of the company. *Id.* ¶¶ 103, 105. Lange agreed, and from mid-April 2022 to August 2022, she was employed as a full-time consultant for TMPL at a decreased salary (to which Lange had also agreed). *Id.* ¶¶ 108–09, 114–15. Lange alleges that during this time, Defendants intentionally misclassified her as an independent contractor instead of an employee, even though she continued to be supervised and treated as an employee. *Id.* ¶¶ 117–19.

### 2.    Lange's Involvement with the Champagne Lounge

On the same day that Walsh asked Lange to agree to be classified as a consultant instead of an employee, Walsh asked her to become his business partner in—and the majority owner of—a hospitality company that would be created specifically to do business within TMPL, with the first project being to develop a champagne bar within TMPL Lexington (the "Champagne Lounge"). FAC ¶¶ 120–21, 123. Lange accepted, and on June 9, 2022, Seven/Twenty Hospitality Group, LLC was created to serve as the holding company for the Champagne Lounge. *Id.* ¶¶ 123–24.

On or about June 12, 2022, Lange asked Walsh about the nature of his relationship with a female employee in Florida, with whom he had been photographed. *Id.* ¶ 128. Lange "expressed

concern about the optics of Walsh being seen with an employee in a close embrace, wearing swimwear in a non-work setting, especially because of the already prolific rumors that existed about his inappropriate past interactions with female employees." *Id.* ¶ 130.  Walsh denied having anything other than a professional relationship with the employee, "brushed off Lange's comments" and asked her, "[W]hat's really changed at TMPL since you started working here?" *Id.* ¶¶ 129, 131.  Later the same day, Lange emailed Walsh with a list of her recent achievements at TMPL.  *Id.* ¶ 133.  Lange alleges that over the next few weeks, she had fewer interactions with Walsh, and he did not respond to her communications as frequently as before.  *Id.* ¶ 134.

At some point in or around June 2022, Walsh began to pressure Lange to resign as a consultant.  *Id.* ¶ 127.  Near the end of that month, Lange and Walsh had a discussion about TMPL's brand marketing strategy.  *Id.* ¶ 135.  Lange "reiterated her desire to portray subjects in TMPL imagery as strong, empowered, and confident, rather than overtly sexy[,]" whereas Walsh allegedly told her that "he wanted sexier imagery and the gyms full of 'girls with hot asses'" as a way of getting men to join the gym, and that he "didn't want the TMPL gyms to be 'gay gyms.'" *Id.*

On July 13, 2022, Lange asked Walsh to clarify the status of their personal relationship, and Walsh told her he could not be in a committed relationship with her or with anyone.  *Id.* ¶¶ 136, 138–39.  "Lange was shocked by this statement because Walsh had repeatedly told her that he had no interest in dating or being romantically involved with anyone else."  *Id.* ¶ 140. The conversation turned into an argument, and Walsh told her "it was all over, 'the job, the champagne lounge, everything.'"  *Id.* ¶ 145.  The next morning, Johnathan Jenkins, TMPL's Director of Operations, called Lange to relay that Walsh told him not to continue any work on the Champagne Lounge.  *Id.* ¶ 149.  Lange also spoke to Walsh later that day, who said Lange's

work was "'clearly suffering' because she was hung up on their relationship[,]" which Lange

denied, and told Lange that she needed to resign from her consultant position at TMPL if they

wanted to move forward with the Champagne Lounge. *Id.* ¶¶ 153–56. Lange told Walsh she did

not feel comfortable resigning until the Champagne Lounge was closer to opening. *Id.* ¶ 157.

A few days later, on July 18, 2022, TMPL's Director of Human Resources Leah Molino

contacted Lange to tell her that she would no longer report directly to Walsh but would instead

report to Anthony Messina, Vice President of TMPL. *Id.* ¶¶ 159–60. The following week,

Messina and Molino informed Lange that they were reviewing her responsibilities and had

questions about the value of her contributions, and that TMPL was rescinding budget allocations

for previously approved projects involving Lange. *Id.* ¶¶ 161–62. Lange alleges that around this

same time, Walsh told another TMPL employee that he was "trying to get rid of" Lange. *Id.*

¶ 171.

On July 27, 2022, Walsh and Lange signed a sublease agreement to open the Champagne

Lounge within TMPL Lexington. *Id.* ¶¶ 167–68. Although Lange believed the sublease was

valid, she later learned it was actually invalid and that Walsh was aware that the sublease was

invalid because Boston Properties, TMPL Lexington's landlord, had not approved it, as required

under the lease. *See id.* ¶¶ 277, 280–83. Lange alleges that Walsh subsequently fraudulently

induced her to resign as Brand Director to work on the Champagne Lounge, although he knew it

could not become operational without a valid sublease agreement and he did not provide the

capital necessary to fund its operations. *See id.* ¶¶ 277–90.

On August 2, 2022, Messina emailed Lange with a new role description for Brand

Director, "which materially changed her responsibilities and effectively demoted her from a

leadership position." *Id.* ¶ 177. Messina additionally told Lange that if she wished to remain

Brand Director, she would have to cease work on the Champagne Lounge or complete it outside her work schedule. *Id.* ¶ 181. The same day, Lange showed Jenkins the emails from Messina, and Jenkins suggested she resign as Brand Director. *Id.* ¶ 189. Lange responded that the only way she would resign was if she spoke to Walsh and got certain assurances from him regarding future work and pay. *Id.* ¶ 191. Jenkins offered to speak with Walsh on her behalf, and he then spoke to Walsh over the phone. *Id.* ¶¶ 192–93. Lange could not hear either side of the phone conversation, but after Jenkins hung up, he relayed to Lange that if she resigned as Brand Director, Walsh would continue compensating her for her work on the Champagne Lounge in advance of its expected opening in fall 2022, would increase his involvement with the project and try to accelerate the opening, and would hire Lange to consult on future TMPL gym design and construction projects and allow her to control retail apparel operations for TMPL. *Id.* ¶¶ 194–95. Lange alleges that she "understood that Walsh would ensure that Lange got paid at least $8,000 per month to match the salary she was receiving from Defendants at the time." *Id.* ¶ 196. Lange resigned as Brand Director the same day by email to Walsh, although she continued to work for Defendants as a cycling instructor and personal trainer. *Id.* ¶¶ 197, 200.

Lange alleges that after her resignation, Walsh "began to walk back the promises he made to Lange the day she resigned as Brand Director[,]" including refusing to pay her for work on the Champagne Lounge until the operating agreement was finalized, remaining unavailable and unresponsive for days at a time, and failing to pay her for work she did within TPML related to design projects and retail sales. *Id.* ¶¶ 207–09, 235. Lange alleges that on September 7, 2022, she met with Walsh and presented him a full business plan for the Champagne Lounge; Walsh approved the plan and budget on the spot. *Id.* ¶¶ 245–46. On September 21, 2022, the two also executed an operating agreement, under which Walsh would provide an initial capital

contribution. *Id.* ¶¶ 250–51.  On October 12, 2022, Walsh informed Lange that the Champagne Lounge would have to be paused for six months because TMPL was in financial distress. *Id.* ¶ 253.  On January 8, 2023, Walsh told Lange that the Champagne Lounge was no longer viable due to financial constraints affecting TMPL and his personal finances; Lange alleges she "could not reconcile Walsh's claims of financial strife with . . . evidence of his lavish spending." *Id.* ¶¶ 266, 302.

### 3.    Non-Payment for Work

Lange also alleges that from September to December 2022, after she had resigned as Brand Director, she spent 10 to 15 hours per week performing work to benefit TMPL, including cleaning out storage rooms, performing inventory, conducting assessments of renovation and repair needs, and creating a team building and corporate event pilot program.  FAC ¶¶ 210–11. She was not paid for this work until Walsh finally paid her $5,000 in late September 2022 and another $5,000 in October 2022; this payment was $3,000 less per month than what she expected to receive, and she was not paid for her work after October 2022. *Id.* ¶¶ 212–22; 378.

She further alleges that from the start of her employment through January 2023, Defendants paid her biweekly; however, "over twenty-five percent of her duties were physical tasks," and that she should have been paid weekly in accordance with NYLL. *Id.* ¶¶ 379–80. She also alleges that Defendants failed to furnish her with a written wage notice at the time of her hiring or at any other time and failed to furnish her with accurate wage statements. *Id.* ¶¶ 381–82.

### 4.    Complaint to Human Resources

On January 13, 2023, Lange met with Alex Hessam, Fitness Manager at TMPL Hell's Kitchen, to discuss her personal training schedule, and discussed with him the recent changes to her employment; Hessam allegedly told her in that conversation that "Walsh was known to ask

out every female employee he sets his sights on[.]" FAC ¶¶ 305–11. Lange also alleged that on January 19, 2023, a TMPL employee told her that another female employee had showed him and other colleagues "gross" messages that Walsh had been sending the female employee, and that the female employee was "uncomfortable receiving [the messages] but was afraid to report it." *Id.* ¶¶ 317–22.

On January 23, 2023, Lange spoke to Molino to seek guidance about having the Seven/Twenty Hospitality Group, LLC sublease validated and explained that she was seeking new investors for the Champagne Lounge. *Id.* ¶¶ 325–26. During that conversation, Lange "disclosed her intimate relationship with Walsh [to Molino] and expressed concerns that he was engaging in discriminatory and retaliatory behavior towards her," and also disclosed that Walsh may have a romantic relationship with an employee in Florida. *Id.* ¶¶ 328–29. Molino allegedly responded that company policy did not prohibit romantic relationships between consenting adults. *Id.* ¶ 330. Lange then told her that a personal trainer at TMPL told Lange about "Walsh sending a female employee inappropriate messages and photos." *Id.* ¶ 332. Molino told Lange she would investigate. *Id.* ¶ 333.

On January 30, 2023, Molino informed Lange that she had completed the investigation and found no evidence of inappropriate behavior. *Id.* ¶ 334. She also informed Lange about a complaint that had been lodged against Lange by a manager at TMPL, "who allegedly complained about feeling uncomfortable when Lange spoke to him about her relationship with Walsh." *Id.* ¶ 341. Molino instructed Lange that she was not to speak with employees about personal relationships and reiterated that directive by email on February 2, 2023. *Id.* ¶ 343.

### 5. Lange's EEOC Charge and Subsequent Conduct by Walsh

Lange filed an Equal Employment Opportunity Commission ("EEOC") charge on April 22, 2023, and the EEOC issued a Notice of Right to Sue on June 14, 2023. FAC ¶¶ 18–19.

Lange gave notice to TMPL that she was resigning as a cycling instructor and personal trainer on June 22, 2023.  *Id.* ¶ 375.

Less than two weeks after Lange filed the EEOC charge, in early May 2023, Walsh began sending Lange direct messages via Instagram, and he approached her in person on the street on May 15, 2023, telling her he missed her and wanted to restart their romantic relationship.  *Id.* ¶¶ 351–55.  Walsh and Lange resumed their intimate relationship that day, and the relationship continued until the end of August 2023.  *Id.* ¶ 363.  On May 16, 2023, Walsh asked Lange to cease all legal action against Defendants; Lange refused to do so, although she continued to engage in a consensual intimate relationship with Walsh.  *See id.* ¶¶ 356–57.  Walsh's entreaties to Lange to end her legal proceedings continued during this period, including requests to "settle their differences privately."  *Id.* ¶¶ 358, 364.  In addition, Walsh allegedly told Lange that her claims were not meritorious, that a lawsuit would destroy her reputation, and that he would file multiple lawsuits against her if she proceeded.  *Id.* ¶ 367.  On August 22, 2023, Walsh proposed that he invest in her hospitality company in exchange for a minority ownership stake, in exchange for Lange ceasing her legal action.  *Id.* ¶ 413.  Lange again declined to end her legal actions against Defendants.  *See id.* ¶¶ 417–18.

## B.   PROCEDURAL HISTORY

Lange filed her complaint on September 12, 2023.  *See* Dkt. No. 1.  On January 5, 2024, she filed the First Amended Complaint.  *See* Dkt. No. 21.  On February 20, 2024, Defendants filed their motion to (i) dismiss all claims for failure to state a claim on which relief can be

granted, and (ii) to compel arbitration of the fraud and fraudulent inducement claims.  Dkt. No.

28.[3]  On February 28, 2024, this action was reassigned to the undersigned.

## MOTION TO DISMISS

### A.    LEGAL STANDARD

In order to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure for failure to state a claim, a complaint must plead "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A

claim only has "facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp.*, 550 U.S. at 556).  A complaint

is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true,

could not raise a claim of entitlement to relief[.]"  *Bell Atl. Corp.*, 550 U.S. at 558.

When ruling on a Rule 12(b)(6) motion, the district court must accept all facts alleged in

the complaint as true and draw all reasonable inferences in favor of the plaintiff.  *See, e.g.*, *Koch*

*v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).  However, courts are not required to

accept legal conclusions as true, and "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678.  In

assessing the sufficiency of the complaint, the court may also consider "documents that are

incorporated into the complaint by reference or attached to the complaint as exhibits, or whose

terms and effect are relied upon by the plaintiff in drafting the complaint. *See Gryl ex rel. Shire*

*Pharms. Grp. PLC v. Shire Pharms. Grp. PLC*, 298 F.3d 136, 140 (2d Cir. 2002).  Facts that

---

[3] The Court will cite Defendants' memorandum of law, filed at Dkt. No. 30, as "Mot."; Plaintiff's opposition brief, filed at Dkt. No. 48, as "Opp."; and Defendants' reply brief, filed at Dkt. No. 52, as "Reply".

appear in a party's brief but that were not alleged in the complaint or found in any documents

properly before the court are not considered.  *See In re iAnthus Cap. Holdings, Inc. Sec. Litig.*

("*iAnthus*"), No. 20-CV-03135 (LAK), 2021 WL 3863372, at *5 (S.D.N.Y. Aug. 30, 2021).

## B.    DISCUSSION

At the outset, the Court notes that Defendants submitted various exhibits in support of

their motion to dismiss.  *See* Dkt. No. 29.  At the motion to dismiss stage, the Court may only

consider the allegations in the Complaint and limited other documents.  *See iAnthus*, 2021 WL

3863372, at *5.  Other than Lange's EEOC charge—which may be considered by the Court at

this stage as an integral part of the pleadings, *see Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.

2001); *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790 (PMH), 2020

WL 2131771, at *2 (S.D.N.Y. May 4, 2020)—none of the exhibits fall within the categories of

documents that the Court may consider, nor do Defendants offer any argument to the contrary.

Thus, the Court has *not* considered the exhibits proffered by Defendants (other than the EEOC

charge) in deciding the motion to dismiss.  *See Palin v. New York Times Co.*, 940 F.3d 804, 810–

11 (2d Cir. 2019) (district courts may exclude additional material on a 12(b)(6) motion and

decide the motion on the complaint alone, or may convert the motion into one for summary

judgment).

### 1.    Lange's Retaliation Claims Are Dismissed

Lange's claims of retaliation under Title VII, the NYSHRL, and the NYCHRL arise from

three events:  (1) Defendants' "forc[ing] [her] resignation" as Brand Manager on August 2, 2022

by changing her job responsibilities and by Walsh's insistence that she resign after she

questioned Walsh's infidelity, *see* FAC ¶¶ 158, 204; (2) Molino's actions in directing Lange not

to discuss her personal relationships with coworkers, *see id.* ¶ 350; and (3) the "constructive[]

discharge[]" of Lange as a cycling instructor and personal trainer on June 22, 2023, at a time

when she was in an intimate relationship with Walsh, based on Walsh's attempts to ask her to drop her legal action. *Id.* ¶¶ 374–77; *see also* Mot. at 2–3; Opp. at 14–18. Whether taken as a whole or individually, Lange's allegations demonstrate that she believed Defendants' conduct was unfair and morally reprehensible. However, the allegations do not plausibly plead retaliation under any relevant law.

To state a claim under Title VII, the NYSHRL, and the NYCHRL for retaliation, the plaintiff must show: (1) she engaged in protected activity under the relevant law; (2) the defendant was aware of this activity; (3) the defendant took an adverse employment action against her; and (4) a causal connection exists between the adverse action and the protected activity. *See Ochoa v. New York City Dep't of Educ.*, No. 20-CV-09014 (ALC), 2021 WL 5450343, at *3 (S.D.N.Y. Nov. 22, 2021); *Harriott v. Success Acad. Charter Schs.*, No. 22-CV-03037 (ER), 2024 WL 757478, at *11 (S.D.N.Y. Feb. 23, 2024). NYCHRL claims are "reviewed independently from and more liberally than federal or state discrimination claims[.]" *Ochoa*, 2021 WL 5450343, at *4 (internal references omitted).

### a.    Resignation as Brand Manager in August 2022

First, Lange's claim that Walsh and others forced her resignation as Brand Manager in August 2022 in retaliation for her complaints to Walsh in June and July 2022 about Walsh's potential relationship with another TMPL employee fails to plausibly allege that Lange engaged in any "protected activity," or that Defendants were aware of any purported protected activity. Accordingly, even accepting all of Lange's allegations as true, these events cannot form the basis for a retaliation claim under any relevant statute.

"The term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012)

(quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  "An employee's complaint may qualify as protected activity . . . 'so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.'" *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14 (2d Cir. 2013) (quoting *Gregory*, 243 F.3d at 701) (Title VII and NYSHRL); *see also Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 331, 334 (S.D.N.Y. 2020) (Title VII, NYSHRL, NYCHRL).[4] "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly*, 716 F.3d at 14–15 (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  "'[M]ere subjective good faith belief is insufficient; the belief must be reasonable and characterized by *objective* good faith.'" *Id.* at 16 (internal references omitted) (emphasis in original) (quoting *Sullivan-Weaver v. N.Y. Power Auth.*, 114 F. Supp. 3d 240, 243 (S.D.N.Y. 2000)).  With respect to the second element of a retaliation claim, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by" the law.  *Galdieri-Ambrosini*, 136 F.3d at 292.

Here, Lange's complaint to Walsh in or around June 2022 was related to his potential infidelity to her, as his intimate partner; specifically, she inquired about the nature of his

---

[4] Specifically, Title VII prohibits discrimination based on race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a).  The NYSHRL prohibits discrimination based on age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence.  N.Y. Exec. Law § 296(1).  The NYCHRL prohibits discrimination based on actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status of any person.  N.Y.C. Admin. Code § 8-107(1)(a).

relationship with a female employee in Florida with whom he was photographed in a non-work setting. *See* FAC ¶¶ 127–30. The conduct of which she complained—his appearing with a bathing-suit-clad female employee in a photograph in a non-work setting (or the inference that he was intimate with a female employee)—does not violate Title VII, the NYSHRL, or the NYCHRL; there is no allegation supporting sex-based discrimination or any other violations of the relevant law. *See Kelly*, 716 F.3d at 16–17 (holding the plaintiff's alleged attempts to dissuade the company vice president from having an affair with an employee did not constitute a protected complaint where there was no allegation of sex-based discrimination or belief by plaintiff that the conduct constituted unlawful discrimination); *Sullivan v. Chappius*, 711 F. Supp. 2d 279, 287 (W.D.N.Y. 2010) (dismissing claim where the plaintiff "complained about matters falling completely outside the scope of the [NYSHRL,]" *i.e.*, an "illicit affair" between the defendant and the plaintiff's secretary).

Moreover, there is no indication in the First Amended Complaint that Lange possessed a reasonable, good-faith belief that she was complaining of conduct prohibited by Title VII, the NYSHRL, or the NYCHRL, or that her employers could have understood her complaints as such. *See Kelly*, 716 F.3d at 16–17. Lange alleged she was in a consensual romantic relationship with Walsh at the time of the June 2022 complaint, and that her complaint to Walsh involved questioning him about the nature of his relationship with another female employee. *See* FAC ¶¶ 127–29. Indeed, in the month following this conversation, Lange asked Walsh to clarify the status of their relationship and was "shocked" when he said he could not be in a committed relationship with her; she described his "pursuing or having sex with multiple employees simultaneously" as "morally reprehensible." *Id.* ¶¶ 138–40, 143. While Lange is entitled to her opinion of Walsh's conduct, immorality does not mean such conduct violates the law or that she

reasonably believed it did. Even setting aside the complaints grounded in her personal relationship with Walsh, at best Lange's complaints about the photograph were that it was not good for Walsh's image or reputation, or the image of the gyms. *See id.* ¶¶ 130, 143. But nothing in the First Amended Complaint suggests that she had a good-faith belief the conduct violated the relevant laws.

Even if Lange had plausibly alleged the first element of retaliation, which she does not, nothing "in [Lange's] behavior, as described in her complaint, would have allowed her employer to 'reasonably have understood that [Lange's] opposition was directed at conduct prohibited by [the law].'" *Kelly*, 716 F.3d at 17 (internal alterations omitted) (quoting *Galdieri-Ambrosini*, 136 F.3d at 292). The use of particular words such as "discrimination" are not needed to put an employer on notice of a protected complaint. *Id.* But Lange's allegation that she "expressed concern about the optics of Walsh being seen with an employee in a close embrace, wearing swimwear in a non-work setting, especially because of the already prolific rumors that existed about his inappropriate past interactions with female employees," FAC ¶ 130, is simply insufficient to create notice that she was making a complaint protected by the law. *See Kelly*, 716 F.3d at 17. To the extent Lange's complaint was rooted in her ongoing romantic relationship with Walsh at the time, and her concerns about his potential infidelity, there is even less ground to satisfy the second element of retaliation. Lange's personal grievances about Walsh's potential infidelity to her do not constitute a protected complaint.

Lange's attempts to recharacterize her complaints as regarding "possible sexual harassment of female employees" and "sexist and homophobic marketing for gyms" also fail. *See* Opp. at 5, 14. First, the First Amended Complaint did not allege that Lange complained to Walsh specifically about his "potential sexual harassment;" this allegation appears only in her

proposed Second Amended Complaint filed in connection with her opposition brief and appears to have no factual basis. While the retaliation causes of action in the First Amended Complaint do contain a general assertion that Defendants retaliated against her "for her opposition to sexual harassment in the workplace," such "[t]hreadbare recitals of ["opposition to sexual harassment" as one of] the elements of a cause of action, supported by mere conclusory statements, do not suffice." *See Ashcroft*, 556 U.S. at 678; FAC ¶¶ 428, 436, 442. As discussed above, Lange's alleged complaint to Walsh about a photograph in or around June 2022 did not constitute protected activity. And the facts alleged about Lange's concerns in July 2022 do not support a characterization that she was reporting possible illegal sexual harassment; rather, Lange told Walsh there were "rumors at TMPL regarding Walsh's conduct with female employees[,]" and her "confus[ion] as to why Walsh had insisted their relationship remain a secret if he was comfortable spending time with other female employees so openly that those interactions led to conversations about how Walsh's conduct made them uncomfortable." FAC ¶ 137. This conversation could not have reasonably been understood by Walsh as a complaint that he was violating the law. The context of the conversation, even as alleged by Lange, was Lange questioning Walsh about the status of their romantic relationship and confronting him regarding potential infidelity. *See id.* ¶¶ 137–43. While it is possible for personal complaints and complaints about illegal conduct to co-exist, nothing about the circumstances of Lange's complaints in the summer of 2022 about Walsh's conduct suggests either that she had a good faith belief that the conduct violated the law (as opposed to morality or "optics"), nor that Walsh should have reasonably understood those complaints to be reports about illegal conduct—such complaints regarding a " preference" do not constitute allegations of unlawful gender or sex discrimination. *See, e.g., Fattoruso v. Hilton Grand Vacations Co., LLC*, 525 F. App'x 26, 28 (2d

Cir. 2013) (summary order) (holding the plaintiff's allegations that his supervisor was using his power to sexually harass an inferior employee did not implicitly give notice that the plaintiff was engaged or reasonably believed he was engaged in protected activity because the plaintiff was complaining about "a [lawful] consensual workplace relationship").

Finally, Lange's allegations that, in a conversation in July 2022, Walsh allegedly stated a desire to feature "girls with hot asses" in marketing in order to attract male clients, and did not want "gay gyms," are insufficient to support her retaliation claim because the relevant anti-discrimination laws relate to conduct by employers in employment matters, not to marketing strategies. *See* 42 U.S.C. § 2000e-2(a)(1), N.Y. Exec. Law § 296, N.Y.C. Admin. Code § 8-107(1)(a). While remarks such as these may shed light on the intent or meaning underlying conduct on a different occasion, or be part of a hostile work environment claim, there is nothing in the allegations regarding the events of June and July 2022 that suggests illegal conduct by Walsh that could be illuminated by these comments. At best, the allegations suggest that Walsh was bringing sexist or homophobic beliefs to his views on marketing strategy. These beliefs are not themselves unlawful, and there is no allegation that anyone other than Lange heard them. Thus, any disagreement Lange may have expressed to Walsh regarding this issue does not constitute "protected activity" sufficient to make out a claim of retaliation.

#### b.    Molino's January and February 2023 Instruction

Lange's allegation that "Molino's actions in response to Lange's communication with Hessam and [Molino about Walsh's conduct] are further evidence of a hostile work environment and retaliatory behavior," FAC ¶ 350, also fails to make out a claim of retaliation under any relevant statute.

17

Lange alleged that in her conversation with Molino, she "disclosed her intimate relationship with Walsh and expressed concerns that he was engaging in discriminatory and retaliatory behavior towards her." *Id.* ¶ 328. She also told Molino that she believed Walsh was romantically involved with an employee in Florida, and that a personal trainer at TMPL had told Lange about "Walsh sending a female employee inappropriate messages and photos." *Id.* ¶¶ 329, 332. All or nearly all of Lange's complaints to Molino were not about any conduct that violates Title VII, the NYSHRL, or the NYCHRL; rather, she disclosed that she had been in a consenting relationship with Walsh, and that Walsh may be intimate with or sending intimate messages to other employees. *See, e.g., Novak v. Waterfront Comm'n of New York Harbor*, 928 F. Supp. 2d 723, 729–30 (S.D.N.Y. 2013) (sex discrimination claims may not be premised solely on mistreatment after the end of a romantic relationship with a supervisor, however unfair or unfortunate the treatment may be); *Kahn v. Objective Sols., Int'l*, 86 F. Supp. 2d 377, 382 (S.D.N.Y. 2000) ("Participation in a consensual office affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender.").

Even assuming that Lange had a reasonable, good-faith belief that she was complaining of conduct that she believed was unlawfully discriminatory, she still fails to plausibly allege the second element of retaliation: that the employer was aware of the protected activity. Although Lange alleges that she complained to Molino of "retaliat[ion]" and "discriminat[ion]," *see* FAC ¶ 328, her use of these particular words is not "sufficient [to put an employer on notice of a protected complaint] if nothing in the substance of the complaint suggests that the complained-of activity is, in fact, unlawfully discriminatory." *Kelly*, 716 F.3d at 17. Rather, Lange's complaint to Molino involved a disclosure that she had been in a relationship with Walsh, that she believed

he may have been romantically involved with an employee in Florida, and that Walsh may have also been sending a female employee "inappropriate messages and photos." *Id.* ¶¶ 328–29, 332. Particularly in the context of Lange airing certain grievances with Walsh as his former romantic partner, including noting that he may have been romantically involved with more than one female employee, nothing in the First Amended Complaint suggests Molino was on notice that Lange was making a protected complaint.

Moreover, even if Lange's second-hand report that Walsh was sending female employees messages and photos that Lange viewed as inappropriate could be construed as a report of a possible hostile work environment or sexual harassment, Molino said she would investigate that allegation and later reported that she investigated and found nothing inappropriate. *Id.* ¶¶ 333–34. Notwithstanding the foregoing, Lange has also not plausibly alleged any adverse employment action or causal connection between her report to Molino and any such action.

An adverse employment action under Title VII is "'conduct that was reasonably likely to deter a person from engaging in [protected activity].'" *Ochoa*, 2021 WL 5450343, at *3 (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 112 (2d Cir. 2013)); *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015); *Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020). Under the NYCHRL, "the plaintiff need not prove any 'adverse' employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Benzinger*, 447 F. Supp. 3d at 129 (internal references omitted); *see also Ochoa*, 2021 WL 5450343, at *4. Additionally, in 2019, the New York State Legislature amended the NYSHRL to direct courts to construe it "liberally;" the effect of the amendment was to render the standard for NYSHRL claims closer to the standard of the NYCHRL. *See* N.Y. Exec. Law § 300; *Uttarwar v.*

*Lazard Asset Mgmt. LLC*, No. 22-CV-08139 (DEH), 2024 WL 1251177, at *6 (S.D.N.Y. Mar. 22,

2024); *Europe v. Equinox Holdings, Inc.*, No. 20-CV-07787 (JGK), 2022 WL 4124763, at *9

n.13 (S.D.N.Y. Sept. 9, 2022).  All of Lange's claims here accrued after 2019, so the Court

assesses the NYSHRL and NYCHRL claims together.  *See Palmer v. eCapital Corp.*, No. 23-CV-

04080 (DEH), 2024 WL 3794715, at *9 n.6 (S.D.N.Y. Aug. 13, 2024).

"In assessing retaliation claims [under the NYCHRL] that involve neither ultimate

actions nor materially adverse changes in terms and conditions of employment, it is important

that the assessment be made with a keen sense of workplace realities, of the fact that the 'chilling

effect' of particular conduct is context-dependent, and of the fact that a jury is generally best

suited to evaluate the impact of retaliatory conduct in light of those realities. . . . [N]o challenged

conduct may be deemed nonretaliatory before a determination that a jury could not reasonably

conclude from the evidence that such conduct was, in the words of the statute, 'reasonably likely

to deter a person from engaging in protected activity.'" *Williams v. New York City Hous. Auth.*,

872 N.Y.S.2d 27, 34 (1st Dep't 2009) (internal footnote omitted).

Here, Lange alleges that on January 30, 2023, a week after she expressed concerns to

Molino about Walsh's conduct, Molino informed Lange that a TMPL manager (who Lange

assumed was Hessam) had lodged a complaint "about feeling uncomfortable when Lange spoke

to him about her relationship with Walsh," and "Molino told Lange that she was not to speak to

employees about personal relationships."  FAC ¶¶ 341–43.  Molino reiterated the same sentiment

by email on February 2, 2023, writing,

> Regardless of whether you are on the clock, you are an employee of TMPL, and
> these conversations should not take place between coworkers while in the clubs.
> We ask that all persons working in the Clubs, both employees and independent
> contractors, refrain from engaging in conversations about their personal
> relationships and other topics that may not be appropriate for work.

*Id.* ¶ 343.

Lange took offense to these communications, alleging that she "had spoken truthfully to Hessam" and "was penalized for speaking to her manager and to Molino." *See id.* ¶¶ 344–45, 348.  But a directive to Lange not to discuss with coworkers while at work her "personal relationships and other topics that may not be appropriate for work," *see id.* ¶ 343—which reiterated a policy apparently applicable to all employees, not just Lange—would not be reasonably likely to deter a person from engaging in protected activity, including making protected complaints, even under the more relaxed standards of the NYCHRL and NYSHRL. Indeed, despite Lange's conclusory allegation that she was "penalized," *see id.* ¶ 348, nothing in the First Amended Complaint suggests that Molino's communications, which merely informed Lange that a complaint about her had been received and asked her to refrain from discussing her personal relationships with coworkers at work, was a formal reprimand or anything more that might reasonably chill or deter an employee from engaging in a protected activity. *Cf. Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 164–65 (2d Cir. 2011) (in an FMLA case, applying the same "materially adverse employment action" standard as in Title VII cases, finding that a formal reprimand placed in an employee's file was materially adverse); *see also Brightman v. Prison Health Serv., Inc.*, 33 Misc.3d 1201(A), at *7, 9 (Queens Cnty. Sup. Ct. 2011) (holding neither a supervisor's "unrealized threats of discipline," including directives to either "go home" or be escorted from the premises for failing to submit a required medical clearance form, or other isolated comments, constituted adverse action under the NYSHRL or NYCHRL because they were not likely to deter a person from engaging in protected activity), *aff'd on other grounds*, 108 A.D.3d 739, 741 (2d Dep't 2013).  This is especially so here, where Lange had in fact been speaking with Hessam about her own consenting relationship with Walsh, where a complaint had been lodged against Lange, and where Molino's direction was merely a reminder to comply with

21

generally applicable company policy by refraining from discussing her personal relationship with her coworkers at work.

Thus, Lange's allegations with respect to her communications with Molino cannot, as a matter of law, support her retaliation claims.

### c.     Conduct After Filing EEOC Charge

Finally, Lange's claim that she was forced to resign due to Walsh's conduct in the summer of 2023—*i.e.*, his requests that she withdraw her EEOC charge and resolve the issue privately after she filed her EEOC charge—also fails because she has not plausibly alleged an adverse employment action.

Lange resigned from TMPL on June 22, 2023.  FAC ¶ 375.  In order to sufficiently allege that she was constructively discharged, Lange must allege "deliberate actions taken by the employer sufficient to cause a reasonable person to feel compelled to resign." *Tulino v. City of New York*, 813 F. App'x 725, 727 & n.2 (2d Cir. 2020) (summary order) (noting that while the NYCHRL standard for constructive discharge has not been fully articulated, the First Department has "appeared to confirm that the standard remains unchanged under the amended NYCHRL and that it mirrors the federal standard"); *Green v. Brennan*, 578 U.S. 547, 555 (2016) (under Title VII, constructive discharge "contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign") (internal references omitted).

From May 15, 2023 until the end of August 2023, during the same time period when Walsh was making the alleged requests that Lange resolve her legal dispute privately, Lange voluntarily resumed her intimate relationship with Walsh.  FAC ¶ 363.  While she alleges that

"Walsh continued to contact Lange and visit her home (often unannounced) nearly every time he visited New York between May 2023 and September 2023," *id.* ¶ 358, this conduct does not plausibly amount to constructive discharge because she was intimately involved with Walsh and voluntarily received him into her home during that time period. *Id.* ¶¶ 360–63. During these consensual romantic visits, Walsh requested that Lange cease her legal proceedings and his companies and settle the issues privately. *Id.* ¶ 364. Lange voluntarily continued to remain in regular contact with Walsh throughout their intimate relationship, before and well after she resigned from TMPL.

The only workplace conduct alleged by Lange occurred the day before she resigned, when Walsh allegedly confronted Lange at TMPL Lexington and "told her she had no case and she was humiliating herself." *Id.* ¶ 372. Lange alleges that the "confrontation" was distressing, both because Walsh discussed a "private legal matter openly in a public setting,"[5] and because Walsh "felt he had the right to have access to Lange and insult her in the workplace." *Id.* ¶ 374.

Lange's allegations that she felt forced to resign due to Walsh's conduct are undercut by their intimate relationship during this time and her voluntarily remaining in contact with and repeatedly receiving him in her home. Lange does not allege that any other TMPL manager or representative made any comment to her whatsoever about her EEOC complaint. Under all the circumstances of this case, taking Lange's factual allegations as true, no reasonable jury could find Walsh's communications with her in the context of an intimate relationship, as well as one isolated statement in the workplace, made the workplace so intolerable as to constitute constructive discharge, particularly in light of the fact that she voluntarily continued to maintain a romantic relationship with Walsh, including well after she resigned. Rather, Lange's

---

[5] Lange does not explain how her legal complaints against her employer, ultimately culminating in a federal lawsuit, constituted a "private legal matter."

allegations amount to a claim that the EEOC charge was a source of friction in her intimate relationship with Walsh, the complication of which contributed to her resignation; this does not amount to constructive discharge in retaliation for protected conduct. *See, e.g., Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 129–30 (1st Dep't 2012) (plaintiff's allegations that an administrator "refused to talk with or deal with him" did not support a claim for retaliation, even under the NYCHRL, because at most, the allegations reflected that his personal relationship with administrators deteriorated and "[a]s a matter of common sense, this sort of breakdown in personal relations is inevitable once a serious lawsuit has been commenced").[6]

Moreover, in order to plead constructive discharge, an employee must explore other options before quitting, a requirement Lange does not dispute. *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498, 506 (S.D.N.Y. 2013); *Stancu v. New York City/Parks Dep't*, No. 20-CV-10371 (ALC), 2022 WL 4581844, at *8 (S.D.N.Y. Sept. 29, 2022). Here, Lange has not alleged that she complained to anyone about Walsh's conduct or took any other steps to address what she now claims was intolerable criticism of her EEOC complaint before resigning.

In short, Lange has failed to plausibly allege that Walsh's conduct with regard to her EEOC complaint, which overwhelmingly was in the context of his role as her consensual sexual partner, amounted to constructive discharge.

---

[6] The circumstances here are vastly different than those in *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-06670 (AT), 2019 WL 4039958 (S.D.N.Y. Aug. 27, 2019), which is cited by Lange. *See* Opp. at 18. In *Rosen*, the plaintiff had alleged a "series of actions taken by [the] [d]efendants made her employment intolerable," including that the defendants began threatening termination, that defendants imposed additional, burdensome tasks on her, and that plaintiff was escorted from her office by security on multiple occasions. 2019 WL 4039958, at *7. Lange does not allege that any similar series of actions were taken by Defendants here, and, for the reasons explained above, she does not plausibly allege constructive discharge.

####     d.        Whistleblower Retaliation Under the NYLL

The NYLL prohibits employers, in relevant part, from:

> Tak[ing] any retaliatory action against an employee, whether or not within the
> scope of the employee's job duties, because such employee . . . discloses, or
> threatens to disclose to a supervisor or to a public body an activity, policy or
> practice of the employer that the employee reasonably believes is in violation of
> law, rule or regulation or that the employee reasonably believes poses a substantial
> and specific danger to the public health or safety[.]

NYLL § 740(2)(a).

Lange's allegations that Walsh forced her resignation as Brand Manager in August 2022

because of her complaints to him about his potential infidelity and communications with other

employees, as described in detail above, do not amount to an allegation that she made a

complaint about "an activity, policy or practice . . . that the employee reasonably believes is in

violation of law, rule or regulation." *See id.* For the reasons explained in detail above, there is

no factual basis to conclude that the conduct complained of violated the law, nor that Lange had

a reasonable belief that the conduct violated the law. *See Rackley v. Constellis, LLC*, No. 22-CV-

04066 (GHW) (RWL), 2024 WL 3498718, at *27 (S.D.N.Y. June 17, 2024) ("To establish a

claim under . . . Section 740, a plaintiff must first allege that she disclosed or threatened to

disclose to a supervisor an activity, policy, or practice of the employer that the employee at least

reasonably believed was illegal or posed a substantial specific danger to public health or

safety."), *report and recommendation adopted with modification*, 2024 WL 3824108 (S.D.N.Y.

Aug. 14, 2024); *Thacker v. HSBC Bank USA, N.A.*, No. 22-CV-07120, (GHW), 2023 WL

3061336, at *6 (S.D.N.Y. Apr. 24, 2023).

Even if Lange's passing on of secondhand information about potential sexual harassment

of another employee to Molino in January 2023 could constitute a report about conduct that

Lange reasonably believed was illegal, the claim would still fail because Lange fails to identify

any employment action that is connected to her complaint or would constitute retaliatory action. For the reasons explained above, Molino's direction to Lange to comply with company policy and refrain from speaking to her coworkers at work about personal relationships did not constitute a "retaliatory action" under the NYLL, which defines such action, in relevant part, as "against an employee in the terms of conditions of employment including but not limited to discharge, suspension, or demotion[.]"  NYLL § 740(1)(e)(i).  The alleged conduct here did not constitute an adverse action even under the relaxed standards of the NYCHRL, and it certainly does not constitute a retaliatory action under the NYLL.  *See Rackley*, 2024 WL 3498718, at \*29 ("Courts analyzing Section 740 whistleblower claims have applied the Title VII retaliation standard to determine whether an employment action is adverse for purposes of a Section 740 claim.").

Finally, as discussed above, Walsh's conduct in asking Lange to withdraw her EEOC charge and resolve the dispute privately also did not amount to retaliatory conduct under the statute because he did not take or threaten to take any adverse employment actions against her "in the terms of conditions of employment," or engage in any other conduct that constitutes "retaliatory action."  *See* NYLL § 740(1)(e)(i).

### 2. Lange's Request to Amend the Retaliation Claims and Add Sex-Based Discrimination Claims Is Denied

Lange's request to amend the First Amended Complaint to add details related to her claims of retaliation is denied because amendment would be futile.  For the reasons explained above, even under the most generous interpretation of the facts, her claims of retaliation fail. Lange seeks to add additional details regarding the alleged retaliation.  For instance, her proposed Second Amended Complaint seeks to add that during her July 13, 2022 conversation with Walsh, she raised concerns of his "potential sexual harassment of" female employees.  Dkt.

26

No. 48-1 ¶ 142.  But even if this were true, her use of the words "sexual harassment" was not sufficient to put Defendants on notice that she was making a protected complaint when, as discussed in detail above, nothing in the substance of the complaint suggested that the conduct was unlawful, especially in the context of Lange complaining to her romantic partner about his potential romantic involvement with other people.  *See Kelly*, 716 F.3d at 17.

Lange has also requested to add claims of *quid pro quo* sex-based discrimination under Title VII, the NYSHRL, and the NYCHRL.  Opp. at 20–21.  This request is also denied as futile.  "To establish a *prima facie* case of quid pro quo sexual harassment, a plaintiff must show (1) that she was subject to *unwelcome* sexual conduct or an *unwelcome* sexual advance and (2) that her reaction to that conduct was used as the basis for an employment decision."  *Barcher v. New York Univ. Sch. of Law*, 993 F. Supp. 177, 184 (S.D.N.Y. 1998) (emphasis added), *aff'd*, 172 F.3d 37 (summary order); *see also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986) ("The gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'").  "Similarly, New York courts have held that employment decisions predicated upon the existence or termination of consensual romantic relationships do not give rise to claims of gender discrimination."  *Kahn*, 86 F. Supp. 2d at 380; *see also Novak,* 928 F. Supp. 2d at 729–30; *Mauro v. Orville*, 259 A.D.2d 89, 91–93 (3d Dep't 1999).

Lange alleged in her First Amended Complaint, among other indications of a consensual relationship, that she "agreed" to date Walsh, that she was "disappointed" when he initially broke off their relationship, and that their "intimate relationship resumed on May 15, 2023 and continued throughout the end of August 2023."  *See, e.g.*, FAC ¶¶ 95, 98, 363.  Similarly in her EEOC complaint, she stated, in a sworn discrimination charge:  "Walsh and Lange's relationship was consensual.  Lange understood that her employment was not at all contingent upon her

relationship with Walsh, and she specifically spoke to him about this." Dkt. No. 29-7 ("EEOC Charge") ¶¶ 74–75. "The law against sexual harassment protects an employee from being harassed or coerced by unwelcome sexual advances. [Lange] seeks to alter this purpose to grant to a participant in a completely voluntary relationship with her superior a claim when her employment is terminated at the end of the affair. There is no authority or logic for such an extension. Rejection and discrimination are not synonymous." *Kahn*, 86 F. Supp. 2d at 381.

Further, Lange proposes to allege in her proposed Second Amended Complaint that Walsh conditioned employment benefits and negative consequences of employment on Lange's acceptance of his sexual advances and sexual conduct. Dkt. No. 48-1 ¶¶ 488, 496, 504. But again, "a difficulty arises from the fact that the relationship was consensual and not unwelcome." *Kahn*, 86 F. Supp. 2d at 381. Indeed, from Lange's own telling, Lange did not reject Walsh's sexual advances and conduct. Rather, *Walsh* (not Lange) ended their romantic and intimate relationships on multiple occasions, and Lange does not allege that he subsequently made any unwelcome sexual advances; thus, there is no indication that any employment benefits or negative consequences were conditioned on Lange's acceptance of Walsh's sexual advances. *See, e.g.*, FAC ¶¶ 97, 139; *Novak*, 928 F. Supp. 2d at 730. "Participation in a consensual office affair does not constitute actionable gender discrimination when the termination of the affair results in discharge. It may constitute unfair and certainly unchivalrous behavior, but not discrimination because of gender." *Kahn*, 86 F. Supp. 2d at 382.[7] The clear picture painted by

---

[7] A claim for sex-based *quid pro quo* discrimination under Title VII would also fail because Lange did not exhaust her administrative remedies. Before filing a Title VII claim in federal court, plaintiffs "must first pursue available administrative remedies and file a timely complaint with the EEOC." *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). In a federal action, a plaintiff may assert claims asserted with the EEOC or claims "reasonably related" to the claims filed with the EEOC. *Id.* A claim is "reasonably related" if the conduct would "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made[;]" in other words, "the focus should be on the factual allegations made in the EEOC charge itself, describing the discriminatory conduct about

Lange's allegations is that Walsh was a terrible boyfriend, who allegedly made false promises, treated Lange terribly, and was unworthy of trust as either a romantic partner or a business partner. However regrettable this alleged conduct may be, it does not amount to employment discrimination, even assuming the truth of every allegation in the First Amended Complaint. The proposed amendments do not change this conclusion.

### 3.    Lange's Wage-Related Claims Are Dismissed but Lange Is Granted Leave to Amend Those Claims

Defendants further argue that Lange's claims for unpaid minimum wage under the FLSA and NYLL, failure to produce wage statements under the NYLL, failure to provide wage notices under the NYLL, and failure to timely pay wages under the NYLL fail for various reasons, including that Lange failed to allege she was an employee covered by the FLSA, and that the First Amended Complaint lacked any specifics as to these claims, such as how many unpaid hours she expended, the tasks she performed, and more. *See* Mot. at 20–22. Lange does not contest these arguments, but instead requests permission to amend the First Amended Complaint to "address the deficiencies identified by Defendants with regard to Plaintiff's wage claims under [the FLSA and the NYLL]." Opp. at 20.

Courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[L]eave to amend is the 'usual practice' and 'refusal to grant leave must be based on a valid ground[.]'" *Bank v. Gohealth, LLC*, No. 21-1287-cv, 2022 WL 1132503, at *1 (2d Cir. Apr.

---

which a plaintiff is grieving." *Id.* at 201 (internal references omitted). Here, Lange's EEOC charge expressly stated that "Walsh and Lange's relationship was consensual" and that "Lange understood that her employment was not at all contingent upon her relationship with Walsh." *See* EEOC Charge ¶¶ 74–75. In light of this concession, the EEOC would not have received "adequate notice to investigate" *quid pro quo* sex-based discrimination. *See Deravin*, 335 F.3d at 202. Moreover, because Lange's federal discrimination claims fail, even if her NYCHRL and NYSHRL sex-based claims would not fail (they would), the Court would decline to exercise supplemental jurisdiction over those claims. *See* 28 U.S.C. § 1367(c).

18, 2022) (summary order) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999)).

Here, Lange's request to amend suggests she could plausibly allege wage-related claims under

FLSA and the NYLL. *See* Dkt. No. 48-1 (Proposed Second Amended Complaint). Defendants

argue that the amendment of Lange's FLSA unpaid minimum wage claim is futile because in the

proposed Second Amended Complaint, she has failed to identify for which Defendant or non-

party she was performing work. *See* Reply at 19. But to the extent such information is needed,

Lange could add this information in amending her complaint.

Defendants further argue that amendment of the claim under NYLL § 191(1)(a) for

failure to timely pay wages—because Lange was paid biweekly rather than weekly from the start

of her employment through January 2023, FAC ¶ 379—would be futile. *See* Reply at 19–20.

They cite to a case from the Second Department in which the court held that where a plaintiff (a

manual worker) alleged that he and putative class members were paid biweekly rather than

weekly, in violation of Section 191(1)(a), the plaintiff did not have a private right of action under

the NYLL. *Id.*; *Grant v. Glob. Aircraft Dispatch, Inc.*, 223 A.D.3d 712, 719 (2d Dep't 2024).

The question of whether Section 191 and Section 198(1-a), the enforcement provision of Section

191,[8] confer a private right of action is a question of New York state law, and federal courts

applying state law must generally follow the decisions of state intermediate appellate courts. *See*

*Charles v. United States of Aritzia Inc.*, No. 23-CV-09389 (MMG), 2024 WL 4167502, at *3

(S.D.N.Y. Sept. 12, 2024) (citing *Broder v. Cablevisions Sys. Corp.*, 418 F.3d 187, 199–200 (2d

Cir. 2005)). Here, state law is unsettled: The First Department has held that the NYLL confers

---

[8] NYLL § 191 provides that "[a] manual worker shall be paid weekly and not later than seven calendar days after the end of the week in which the wages are earned[.]" NYLL § 191(1)(a)(i). NYLL § 198(1-a) permits an employee who is "paid less than the wage to which [she is] entitled" to bring a claim "to recover the full amount of any underpayment, all reasonable attorney's fees, prejudgment interest . . . and, unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law, an additional amount as liquidated damages." NYLL § 198(1-a).

an express and implied private right for employees to sue employers for frequency violations, *see Vega v. CM & Assocs. Constr. Mgmt., LLC*, 175 A.D.3d 1144, 1146–47 (1st Dep't 2019), whereas the Second Department subsequently held that the NYLL did not provide an express private right of action for biweekly, rather than weekly, payment in violation of NYLL § 191(1)(a), nor was there an implied private right of action. *Grant*, 223 A.D.3d at 719. Therefore, this Court must "carefully . . . predict how the state's highest court would resolve the uncertainty or ambiguity." *Charles*, 2024 WL 4167502, at *3 (quoting *Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 497 (2d Cir. 2020)). This Court agrees with the reasoning of *Vega* rather than *Grant* and predicts that the New York Court of Appeals is more likely to adopt *Vega*, which is in line with the conclusion of the majority of district courts in this Circuit. *Id.* at *4 (collecting cases); *see also Espinal v. Sephora USA, Inc.*, No. 22-CV-03034 (PAE) (GWG), 2024 WL 4241537 (S.D.N.Y. Sept. 19, 2024). Accordingly, barring an intervening clarification of New York state law, amendment of the claim under Section 191 would not be futile.

Because Lange's amendment to her complaint would not be futile, and any prejudice to Defendants from such amendment is minimal, Claims Six to Ten of the First Amended Complaint (the "Wage-Related Claims") are DISMISSED, and Lange is GRANTED leave to amend the First Amended Complaint with respect to the Wage-Related Claims.

## MOTION TO COMPEL ARBITRATION

Defendants argue that Lange's claims for fraud and fraudulent inducement—in which Lange alleges that Walsh "misrepresented the validity of the sublease presented to [her] for the Champagne Lounge" to induce her to resign as Brand Director and instead work towards the opening of the Champagne Lounge, *see* FAC ¶¶ 451–56—must be arbitrated pursuant to an arbitration agreement between the members of Seven/Twenty Hospitality Group, LLC. The Court agrees.

## A.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") "embodies a national policy favoring arbitration."

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016) (internal references omitted)

(quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)).  "This policy is founded

on a desire to preserve the parties' ability to agree to arbitrate, rather than litigate, disputes."  *Id.*

at 229 (internal marks and references omitted) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d

110, 118 (2d Cir. 2012)).  Courts consider two factors in determining whether a dispute is

arbitrable: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that

agreement encompasses the claims at issue."  *Holick v. Cellular Sales of New York, LLC*, 802

F.3d 391, 394 (2d Cir. 2015) (quoting *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 281

(2d Cir. 2005)).  In deciding motions to compel arbitration, courts apply a similar standard to that

applicable to a motion for summary judgment.  *Nicosia*, 834 F.3d at 229.  Courts must consider

all relevant, admissible evidence submitted by the parties and draw all reasonable inferences in

favor of the non-moving party.  *Id.*

## B.    DISCUSSION

As detailed above, Lange agreed to become Walsh's business partner to develop the

Champagne Lounge, and Seven/Twenty Hospitality Group, LLC was created on June 9, 2022 to

serve as the holding company for the Champagne Lounge.  FAC ¶¶ 120–21, 124–25.  On July

27, 2022, Walsh and Lange signed a sublease agreement to open the Champagne Lounge.  *Id.*

¶¶ 167–68.  Lange alleges that although she believed at the time that the sublease was valid, it

was actually invalid, and Walsh was aware that the sublease was invalid; she alleges that he

fraudulently induced her to resign from her job as Brand Director to work on the Champagne

Lounge, despite knowing that it could not become operational without a valid sublease

agreement or capital contributions.  *Id.* ¶¶ 277–90, 451–56.

Defendants submitted the operating agreement of Seven/Twenty Hospitality Group LLC, which is signed by Lange and Walsh and dated September 21, 2022 and which provides:

> Dispute Resolution. Prior to commencement of any legal action hereunder (except for injunctive relief), the Members agree to attempt to resolve such dispute through mediation for a period of forty-five (45) days after notice of such dispute by one Member to the other. Upon the occurrence of a dispute between the Parties as well as with the Company arising under or with respect to the operations of the Company or relating to this Agreement, such dispute shall be submitted to arbitration in the state of New York City, New York under one arbitrator, under the rules of the American Arbitration Association. The arbitration award shall be final and binding upon the Parties and enforceable in any court of competent jurisdiction. Notwithstanding the above, a Party shall have the right to seek provisional equitable relief against the other Party in any jurisdiction in which the second Party is alleged to be committing a breach of this agreement.

Dkt. No. 29-6 ("Operating Agreement") § 9.8.

The agreement requires that disputes between the parties "arising under or with respect to the operations of [Seven/Twenty Hospitality Group LLC] or relating to [the Operating Agreement]" be submitted to arbitration. *Id.* The fraud and inducement claims "aris[e] under" or are "with respect to" the operations of Seven/Twenty Hospitality Group LLC (and particularly the operability of the company in light of the invalid lease agreement); as such, those claims must be arbitrated.

Lange does not challenge the existence of an arbitration agreement or that the agreement encompasses the types of claims at issue. Rather, she argues that she is bringing the fraud and fraudulent inducement claims against Walsh and Defendants, not against Seven/Twenty Hospitality Group LLC, which is named in the operating agreement. *See* Opp. at 19. But Lange's claims for fraud and fraudulent inducement are made only against Walsh, not the other Defendants. FAC ¶¶ 450–56. The arbitration agreement expressly covers "dispute[s] between the Parties," and the parties to the contract are the "Members," Lange and Walsh. Operating

Agreement at 1, 24.  Thus, the arbitration provision covers Lange's claims of fraud and fraudulent inducement against Walsh.

Lange also argues that her signing of the Operating Agreement was induced by fraud, and that "[i]f the arbitration clause was induced by fraud, there can be no arbitration[.]"  *See* Opp. at 20 (internal references omitted) (quoting *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 457 (2d Cir. 1995)).  Even if Lange was fraudulently induced into entering the *Operating* Agreement, this is a separate issue from whether she was fraudulently induced into entering the *arbitration* agreement contained within the Operating Agreement.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967); *ACE Cap. Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002) ("It is well settled that a claim or defense of fraudulent inducement, when it challenges generally the enforceability of a contract containing an arbitration clause rather than specifically the arbitration clause itself, may be subject to arbitration.").  Here, Lange has only alleged that the Operating Agreement itself was fraudulently induced and has made not allegations or arguments that the arbitration agreement was fraudulently induced; as such, the fraud and fraudulent inducement claims are subject to arbitration.  *ACE Capital Re Overseas Ltd.*, 307 F.3d at 30 (where the plaintiff never contended that the "alleged fraud was directed specifically to the arbitration clause," but rather argued that the whole agreement was fraudulently induced, the "claim of fraudulent inducement is not on its face precluded from arbitration.").

The motion to compel arbitration of the fraud and fraudulent inducement claims is GRANTED.

## CONCLUSION

For all of the reasons set forth above, Lange's claims for retaliation in violation of Title VII, the NYSHRL, NYCHRL, and NYLL are DISMISSED, and leave to amend the First Amended Complaint with respect to those claims is DENIED.  Leave to amend the First Amended Complaint to add claims of sex-based discrimination is DENIED.  The motion to compel arbitration of the claim for fraud and fraudulent inducement against Walsh is GRANTED.  Finally, Lange's Wage-Related Claims under the FLSA and NYLL are DISMISSED, but Lange is GRANTED leave to amend the First Amended Complaint with respect to those claims; Lange must file a Second Amended Complaint **within 30 days of the date of this Order.**

The Clerk of Court is respectfully directed to terminate Dkt. No. 28.

Dated: July 10, 2025
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge